ALLIED PROCESSORS, INC., Plaintiff-Respondent-Cross-Appellant,

v.

WESTERN NATIONAL MUTUAL INSURANCE COMPANY, Defendant-Appellant-Cross-Respondent.†

Court of Appeals

*No. 00–1490. Submitted on briefs February 12, 2001.—Decided May 24, 2001.*

2001 WI App 129

(Also reported in 629 N.W.2d 329.)

†Petition to review denied.

On behalf of the defendant-appellant/cross-respondent, the cause was submitted on the briefs of *John P. Buckley* and *James T. Martin* of *Gislason, Martin & Varpness, P.A.* of Edina, Minnesota.

On behalf of the plaintiff-respondent/cross-appellant, the cause was submitted on the briefs of *Toby E. Marcovich* and *David A. Kropid* of *Marcovich, Cochrane, Milliken & Swanson, LLP* of Superior.

Before Vergeront, Roggensack and Lundsten, JJ.

¶ 1. VERGERONT, J. Western National Mutual Insurance appeals the judgment in favor of its insured, Allied Processors, Inc. (API), entered on a

jury's verdict finding bad faith and awarding punitive as well as compensatory damages. Western National contends the evidence was insufficient for a finding of bad faith in refusing to settle a personal injury claim against API and for an award of punitive damages. We conclude the evidence was sufficient on both points.

¶ 2. Western National also appeals on two grounds the trial court's order awarding API attorney fees for prosecuting the bad faith action: (1) attorney fees are not available as a matter of law since this is a third-party action, not a first-party action; and (2) API did not establish that its attorney fees, based on a one-third contingency contract, were reasonable. We conclude that a prevailing party in a third-party bad faith action may recover attorney fees as compensatory damages, and we affirm the amount of the attorney fees for the reasons we explain in the decision.

¶ 3. API cross-appeals the trial court's order determining it could not recover as compensable damages the expenses incurred in retaining expert witnesses to prosecute its bad faith claim or the travel expenses for its attorneys. We conclude that as a prevailing plaintiff in a bad faith action, API may recover as compensatory damages reasonable expenses, in addition to attorney fees that it incurred in litigating the bad faith claim. Because Western National does not contend the expert witness fees or travel expenses were not reasonable, we reverse the trial court's order excluding them from compensatory damages and remand.

## BACKGROUND

¶ 4. API's bad faith claim against Western National arose out of Douglas Davis's personal injury suit against API and Western National. Davis was an

employee of an outside painting firm performing work at API's plant. He was injured while using a hydraulically-operated aerial lift owned and maintained by API. The lift malfunctioned such that Davis was unable to stop its ascent and was pinned between the lift and the ceiling. He suffered injuries to his spine and neck. He received worker's compensation benefits of $142,727.10, of which approximately $90,000 was for medical expenses and the balance for loss of earnings.

¶ 5. At the time of Davis's injury, API was covered under two policies issued by Western National: a primary, occurrence-based general liability policy with single and aggregate limits of $500,000, and a commercial umbrella liability policy with limits of $2,000,000. The umbrella policy contained an endorsement excluding punitive damages from coverage, but the primary policy did not contain such an endorsement.

¶ 6. Davis filed a complaint against API and Western National on January 31, 1995, claiming both compensatory and punitive damages. Western National retained Gregory Weyandt to provide a defense for API, and after unsuccessful efforts at settlement, the case went to trial. The jury found Davis's employer not negligent and both API and Davis negligent; found the negligence of each of the two to be causal and attributed 90% of the fault to API and 10% to Davis. It awarded $585,000 in compensatory damages, including $95,000 for past medical expenses, $45,000 for future medical expenses, $25,000 for past wage loss, $250,000 for future loss of earning capacity, and $170,000 for past and future pain, suffering, and disability. The jury also awarded $500,000 in punitive damages. API paid the punitive damages itself: under the policies' terms, the primary policy was applied first to the compensatory damages, which exhausted that

coverage, and the umbrella policy contained an exclusion for punitive damages.

¶ 7. API's complaint in this case alleged that prior to trial Davis offered to settle all his claims against API well within the $500,000 limits of the primary policy; that Western National believed Davis's claim for punitive damages was valid, but nevertheless refused to settle; that Western National failed to make a reasonable appraisal of Davis's chances of winning at trial and the amount of damages; and that this failure demonstrated a significant disregard of API's interests and was made in bad faith. The complaint sought compensatory and punitive damages.

¶ 8. The jury found that Western National's decision not to settle Davis's case was made in bad faith and it awarded $500,000 in compensatory damages and $350,000 in punitive damages.[1] The court denied Western National's post-verdict motions for a directed verdict and to change the answers.[2] The court awarded attorney fees in the amount of $166,667.67 as part of API's compensatory damages, but denied API's request to include its expenses for expert witness fees and attorney travel. The court awarded API twice the statutory costs for a total of $11,125.02 and prejudgment interest of $111,305.25.

---

[1] It appears the parties stipulated that $500,000 was the appropriate amount of compensatory damages if bad faith was found.

[2] Western National moved to dismiss the claim for punitive damages at the close of API's case, and the court withheld a ruling until the close of all evidence. At the close of all evidence, the trial court denied Western National's motion for a directed verdict on API's bad faith claim and on its request for punitive damages.

## BAD FAITH

*Legal Standard*

■■■

¶ 9. An insurer owes a general duty to its insured to settle or compromise a claim made against the insured. *Mowry v. Badger State Mut. Cas. Co.*, 129 Wis. 2d 496, 510, 385 N.W.2d 171 (1986). This duty is implied from the terms of the contract which give the insurer the absolute control of the defense of the action against the insured. *Id.* Because the insured has given up something of value to the insurer—namely, the right to defend and settle a claim—the insurer is said to be in the position of a fiduciary with respect to the insured's interest in settlement of a claim. *Id.* at 511. The insurer has the right to exercise its own judgment in determining whether a claim should be settled or contested; but in order to be made in good faith, a decision not to settle a claim must be based on a thorough evaluation of the underlying circumstances of the claim and on informed interaction with the insured. *Id.* at 510. This duty gives rise to several obligations on the part of the insurer. *Id.* First, the insurer must exercise reasonable diligence in ascertaining facts upon which a good faith decision to settle or not settle must be based. *Id.* Second, where a likelihood of liability in excess of policy limits exists, the insurer must so inform the insured so that the insured might properly protect himself. *Id.* Third, the insurer must keep the insured timely abreast of any settlement offers received from the victim and of the progress of settlement negotiations. *Id.*

■■

¶ 10. When a claim of bad faith is presented to a jury, in addition to finding that the insurer breached

one of the duties it owed to its insured, the jury must also find the breach demonstrated a significant disregard of the insured's interests in the decision to litigate rather than to settle. *Warren v. American Family Mut. Ins. Co.,* 122 Wis. 2d 381, 385–86, 361 N.W.2d 724 (Ct. App. 1984). The jury in this case was given the standard jury instruction, WIS JI—CIVIL 2760, which instructed that API's burden of proof on the first finding was "to a reasonable certainty, by the greater weight of the credible evidence," and, on the second finding, "to a reasonable certainty by evidence that is clear, satisfactory, and convincing."

¶ 11. Western National contends the evidence does not support a finding of bad faith based on the requisite burden of proof. It concedes there is evidence it misjudged the value of Davis's case, but it asserts that does not constitute bad faith. It also concedes its erroneous view on punitive damages coverage may have been negligent, but it asserts that did not result in a greater exposure for API or leave API unrepresented on Davis's claim for punitive damages. And mere negligence, API points out, is not in any event bad faith.

¶ 12. A motion challenging the sufficiency of the evidence may not be granted unless, considering all credible evidence in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a verdict in that party's favor. WIS. STAT. § 805.14(1) (1999–2000).[3] This standard applies both to the trial court and to the appellate court reviewing the trial court's ruling. *Weiss v. United Fire & Cas. Co.,* 197 Wis. 2d 365, 388–89, 541 N.W.2d 753 (1995). Because the trial court is in a better posi-

---

[3] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

tion to decide the weight and relevancy of the testimony, an appellate court must give substantial deference to the trial court's better ability to assess the evidence and may not reverse unless the trial court is clearly wrong. *Id.*

*Evidence*

¶ 13. The testimony at trial on the evaluation of Davis's claim and on settlement efforts included the following. Mark Lapham, the general counsel of Western National, testified that he made an initial evaluation of Davis's claim in February 1995 based on the investigation of outside adjusters. He noted there were questions concerning how the accident happened and some limited information that Davis had preexisting injuries and that the injuries might not be as serious as he claimed. Based on this evaluation and on the erroneous information that the total subrogated worker's compensation claim was $90,000, Lapham posted a reserve of $125,000—$75,000 for Davis and $50,000 for the subrogated claim.

¶ 14. Lapham and Weyandt both testified they erroneously believed that, even though the primary policy did not contain an exclusion for punitive damages, the policy did not cover punitive damages.[4] However, two internal Western National memos, which API introduced into evidence, would permit a jury to reasonably infer that as of the summer of 1995, Lapham knew that without a specific exclusion, there was or might be coverage for punitive damages. Lapham wrote to API soon after Davis filed his suit

---

[4] The jury was instructed that a policy of insurance covers punitive damages unless coverage for them is expressly excluded.

stating that neither policy covered punitive damages, and therefore API might wish to retain its own counsel to advise on its potential exposure for punitive damages. API believed Lapham was incorrect and that there was coverage for punitive damages. API asked its own attorney to become involved, but discontinued his involvement after March 1995 because it was comfortable with Weyandt's defense.

¶ 15. As early as May 1995, Weyandt knew, and communicated by letter to Lapham, that API had not followed its own safety procedures with respect to the machine; a jury would likely conclude API was negligent; and there was evidence indicating that, in a hurry for quality control inspections, API "probably did encourage the painters to use an unsafe shortcut." Weyandt added, "If that is the case, API has to be concerned about punitive damages being awarded. Even if API did not so encourage the painters, it's likely a jury will so conclude."

¶ 16. After Davis's deposition, which Weyandt had hoped would provide evidence of contributory negligence, Weyandt reported in writing to Lapham on June 28, 1995, that "these depositions did not prove very helpful," and that Davis testified he insisted on a replacement solenoid for the machine, watched it being installed, told the maintenance man when it failed, watched it being repaired, and then safely tested it himself twice. Weyandt posited some things Davis could have done to avoid the injury, but summed up by saying: "We are in a position that we may be able to place some fault on plaintiff, but it may be that a jury will find he was not at fault in any way." Weyandt also expressed the view that there was no evidence that API's failure to follow its safety practices had caused the accident, but that investigation was continuing on

whether the replacement solenoid was compatible with the equipment. Subsequent discovery disclosed that the replacement solenoid was purchased at an auto supply store and was not compatible with the machine.

¶ 17. Lapham testified that his evaluation did not change based on the information he received from Weyandt during 1995. Throughout that year, he testified he believed the defense would have an expert to dispute Davis's theory of the cause of the machine's malfunction. He also believed there was evidence Davis might not be as seriously hurt as he claimed, and he viewed evidence of Davis's problems with alcohol and of prior injuries as a basis for challenging the amount of medical expenses and the loss of earning capacity that Davis was claiming.

¶ 18. Trial was scheduled for December 2, 1996. On October 1, 1996, Davis, through his counsel, James Parent, filed a written demand of $750,000 for settlement. Both Weyandt and Lapham considered this demand to be excessive and it did not prompt an offer from Western National. In mid-October, Parent's law firm associated with Attorney Timothy Aiken for the trial of the case. Aiken testified that when he became involved, there was a $230,000 demand from Davis on the table; Davis, he said, was drinking during that time period and had personally insisted the $750,000 demand be lowered to $230,000. However, at Aiken's insistence, Davis stopped drinking, and once sober, he was no longer interested in settling for $230,000. According to Aiken, before taking the $230,000 off the table, he spoke to Weyandt about it, asked if he was going to meet the $230,000 demand, and said it would be taken off the table if not accepted within a specified time. When Weyandt said he could not meet the demand, Aiken withdrew it. Parent corroborated that

the $230,000 demand was in part due to Davis's request to settle quickly, but Weyandt and Lapham both denied there ever was such a demand. Alan Heartman, the API partner most involved in the matter, never heard of the $230,000 offer.

¶ 19. In the latter part of October 1996, there were a number of unfavorable developments for API's defense, which Weyandt conceded. He reported by letter dated October 22, 1996, to Lapham on two developments that he described as not favorable—the manlift malfunctioned in an inspection with Davis's experts, and Aiken, a successful and experienced litigator, had become involved in the case. A week later, after the deposition of the person who did an annual inspection of the machine, Weyandt wrote to API, copying Lapham, and reported that the person was very critical of the maintenance of the machine and indicated it was unsafe in many ways. Weyandt stated he wanted API to be aware that "there is a risk in this case that punitive damages could be submitted to the jury and that they could be awarded against you." Weyandt informed API he was not giving Western National any opinions on coverage and had not reviewed API's policies, but that generally punitive damages are not covered by insurance policies and thus API had exposure. Weyandt recommended that API discuss this letter with its own attorney. The same day Weyandt wrote API, he wrote separately to Lapham, stating he had "some concern for a punitive damages claim, particularly with the addition of the more experienced trial lawyer."

¶ 20. In response to Weyandt's letter, API hired Attorney Christopher Gramstrup, who spoke with Weyandt by phone on November 22, 1996. Gramstrup told Weyandt that API wanted to settle the case so API

would not be exposed to punitive damage claims. In a follow-up letter sent later that day, Gramstrup stated that if the case could not be settled, other concessions should be made to protect API from punitive damages—for example, agreeing to exclude testimony on Davis's alcoholism in exchange for his dropping the punitive damages claim.

¶ 21. Another adverse development for the defense was the change in its expert's opinion based on a new theory expressed by Davis's expert on the reason for the machine's malfunction. Before this development, Weyandt had considered the expert's testimony to be very favorable for the defense on the issue of cause, and he had communicated this to Lapham. After the change in the defense expert's opinion, Weyandt decided not to use him at trial, and he also communicated this to Lapham. Weyandt also wrote to Gramstrup explaining that, based on the defense expert's most recent opinion, he was recommending to API and Western National that in trying the case they admit API's negligence.

¶ 22. Between November 13 and November 18, 1996, Lapham reviewed the entire file for the purpose of making a settlement evaluation. The notes from this evaluation were almost wholly concerned with Davis's medical record. Lapham still did not know the correct amount of the subrogated claim. He learned of it on November 21, 1996, and, as a result he increased the reserve for the subrogated claim to $150,000. He left the portion of the reserve for Davis at $75,000.

¶ 23. Sometime in the weeks just preceding trial, Aiken made a new oral demand in the $400,000 to $450,000 range. Lapham authorized Weyandt to settle for $150,000, which was to include the subrogated claim. Lapham's assessment at that time was that

there would likely be a verdict in the $150,000 to $200,000 range. He testified that the corrected information on the subrogated claim caused him to change his valuation of a reasonable settlement, but that Aiken's entry into the case, the loss of the defense expert, and the unfavorable evidence on API's maintenance of the machine did not cause him to change his valuation. He testified that his assessment of the punitive damages claim was that it would likely go to the jury, but he did not believe the jury would award punitive damages, and if it did, he thought they would be less than $5,000. In contrast, in a letter written after Davis's trial to API and Lapham, Weyandt stated that prior to trial he felt there was a "strong case" for punitive damages.

¶ 24. In the course of Aiken's and Weyandt's settlement discussions either just before or at the beginning of trial, Aiken gave an indication that $350,000 would settle the case, and Lapham indicated to Weyandt he could go to the "high 100's." Weyandt testified that when Davis's demand was at $400,000 and "sliding down," he thought that the case should settle, and he told Lapham. In an effort to reach a settlement, Weyandt proposed to API that it contribute $100,000 to a settlement in view of its exposure to punitive damages; he felt Lapham would only go to $200,000 and therefore a settlement would take a significant contribution from API. Lapham testified he was not aware of Weyandt's proposal that API contribute to a settlement, and Weyandt testified he did not recall discussing it with Lapham. API refused to contribute because it believed punitive damages were covered.

¶ 25. Also during the weekend before trial began and as it was getting under way, Aiken and Weyandt

had a number of discussions on possible agreements whereby Davis would withdraw his demand for punitive damages in exchange for concessions by API. However, no agreement was reached. The possible concessions included not introducing any evidence concerning Davis's problems with alcohol and drugs, stipulating Davis was not at fault, or stipulating that API's negligence was causal. Weyandt discussed these possibilities with Lapham. While the testimony on who made what proposals and when was inconsistent, there was evidence Aiken proposed that API admit to complete liability, meaning causal negligence by API and no comparative negligence by Davis, in exchange for Davis dropping the punitive damage claim; but Weyandt was not willing to trade contributory negligence for the punitive damage claim. Weyandt felt it likely the jury would find Davis 10–30% causally negligent, and he was hoping it would be higher.

¶ 26. On the date trial began, Gramstrup hand delivered a letter to Weyandt that "once again request[ed] that this matter be settled within the insurance company's policy limits," and opined that the punitive damages claim was covered and Western National's failure to settle within policy limits constituted bad faith. Gramstrup attended the trial. He testified it did not go well for API and he continued to urge Weyandt to settle the case. There was testimony that Davis's vocational expert was more persuasive than the defense had anticipated, and the defense did not have their own vocational expert; there was also testimony that the defense's efforts to discredit Davis were not as successful as it had anticipated. Weyandt reported regularly to Lapham during the trial on how it was going.

¶ 27. At one point during the trial, Gramstrup urged Weyandt to call Lapham to tell him that API wanted the case settled. The call did not result in any different settlement authority from Lapham, and Weyandt told that to Gramstrup. Gramstrup and Parent testified that when Weyandt returned from that call, he said "they were playing with fire." Weyandt testified he did not recall saying that.

¶ 28. According to Gramstrup, after Weyandt reported to him on that call, he asked Weyandt for Lapham's number. He wanted to let Lapham know he thought $350,000 was reasonable, the offer he (Lapham) had on the table was too low, and punitive damages were covered. Gramstrup called, asked for Lapham, was put on hold, and then was told Lapham did not wish to speak to him. Lapham testified that all his calls come to him personally and he never received such a call; he also testified it would not have changed his evaluation of the case.

¶ 29. Both API and Western National had expert witnesses. API's experts testified that Western National engaged in bad faith because its evaluation of Davis's claim was unreasonably low, and it unreasonably refused to settle for less than $500,000 or stipulate to the removal of the punitive damage claim in exchange for a concession offered by Davis, since the risk of a large punitive damages claim was significant. Western National's expert testified that Western National's valuation and settlement positions were reasonable and it did not breach any duty to API.

¶ 30. Aiken testified that he had evaluated the compensatory damages at between $650,000 and $750,000, and he asked the jury for $650,000. Davis's $350,000 demand remained on the table throughout the trial until the verdict was returned.

*Analysis*

¶ 31. We conclude that based on this evidence a jury could have found Western National breached a duty to API in a number of ways. The jury could have found Lapham's evaluation of Davis's claim was not reasonable because, after his initial evaluation, he did not adjust it upward, except to correct the error on the amount of the worker's compensation claim, even though subsequent developments significantly weakened the defense of no causal negligence and significantly strengthened the claim for punitive damages. The fact that Lapham was willing to authorize only $150,000, even after he knew the worker's compensation carrier had paid almost $100,000 more than that, is also evidence from which a reasonable jury could conclude his evaluation was not reasonable. And, although Weyandt testified that the defense's case went well, the jury could have chosen to believe Gramstrup's and Aiken's testimony to the contrary and considered it unreasonable not to alter the appraisal of the case based on developments at trial.

¶ 32. With respect to the claim for punitive damages in particular, there was ample evidence from which a jury could find Western National's appraisal of that claim was not reasonable. First, the jury could reasonably have decided Lapham and Weyandt were negligent in not knowing that under Wisconsin law the primary policy covered punitive damages because they were not excluded. The jury could also have decided, contrary to Western National's assertion, that this negligence harmed API's interests: the jury could have inferred Lapham and Weyandt paid little attention to defending against the punitive damages claim because of their belief that there was no coverage.

¶ 33. A jury could also reasonably decide Lapham's assessment that the jury would either not award punitive damages or award only $5,000 was not reasonable. Lapham had no notes showing his valuation of the punitive damages claim, while he had detailed notes on his valuation of the compensatory damages claim; from this the jury could infer he did not consider the punitive damages at all. In addition, the jury could find that Weyandt, who was familiar with the evidence on punitive damages and who conveyed his concerns to Lapham, considered it likely that there would be a substantial punitive damages award: besides his letters and his efforts to settle the case as trial approached, there was his request that API contribute $100,000 to the settlement, from which the jury could infer that Weyandt thought API had at least that exposure for uncovered punitive damages.

¶ 34. The evidence also permits a finding that there was a demand of $230,000 by Davis that Weyandt did not convey to API. While there is evidence supporting Western National's position that such a demand was never conveyed to Weyandt, the jury could have chosen to believe the contrary evidence.

¶ 35. In addition to supporting the jury's finding that Western National breached its duty to API, the evidence also supports a finding, to a reasonable certainty by clear and convincing evidence, that the breach was not simply negligence, but was a substantial disregard of API's interests. There was strong evidence, if the jury chose to draw certain reasonable inferences and make certain credibility determinations, that Western National unreasonably evaluated the punitive damages claim and did not accept the

$230,000 demand,[5] refused to "trade" dropping comparative fault for dropping punitive damages, and refused to settle just before or during trial for $350,000 because it was simply unconcerned with API's exposure for punitive damages and concerned only with paying as little as possible for compensatory damages. In addition to the evidence discussed in the preceding four paragraphs, this evidence includes Lapham's refusal to take Gramstrup's call during trial, and Weyandt's comment that Western National was "playing with fire." Also, if the jury believed Lapham knew that without an exclusion for punitive damages the primary policy might or did cover punitive damages, the jury could reasonably view his failure to inform API and Weyandt of this as evidence of a substantial disregard of API's interests.

¶ 36. Western National points to other evidence or other inferences from the evidence in support of its arguments that its decision to litigate rather than settle was based on a good faith misjudgment. However, although the evidence might have supported a different verdict, that is not the proper inquiry for our appellate review. Applying the correct standard of review, we are persuaded the trial court did not err in deciding that the evidence supported the jury's findings, based on the requisite standards of proof, that Western National breached its duties to API and this breach demonstrated a significant disregard of plaintiff's interests such that it was bad faith.

[5] At the time this demand was on the table (according to Aiken's testimony), Lapham still had only $125,000 posted for a reserve based on his incorrect information on the worker's compensation claim.

## PUNITIVE DAMAGES

¶ 37. Western National also challenges the sufficiency of the evidence to support the jury's verdict on punitive damages. The jury was properly instructed that in order to award punitive damages, it must find, to a reasonable certainty by evidence that is clear, satisfactory and convincing, that Western National acted maliciously toward API or in intentional disregard of its rights. WIS. STAT. § 895.85(3). API did not and does not contend Western National acted maliciously. The jury was instructed that "a person acts in intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are practically certain to result in the plaintiff's rights being disregarded."[6]

██

¶ 38. Applying the standard of review we have set forth above, we conclude the trial court did not err in deciding there was sufficient evidence for a jury to find Western National acted in intentional disregard of API's rights. We are satisfied the evidence we have discussed in the context of the bad faith claim, with credibility conflicts resolved and reasonable inferences drawn in API's favor, is sufficient for a reasonable jury

---

[6] This definition of "intentional disregard of the plaintiff's rights" follows WIS JI—CIVIL 1707.1, and is based on the definition of "intentionally" in WIS. STAT. § 939.23(3), which applies in criminal law. As explained in the comments to WIS JI—CIVIL 1707.1, use of this definition for punitive damages finds support in *Shepard v. Outagamie County*, 189 Wis. 2d 279, 286–87, 525 N.W.2d 764 (Ct. App. 1994), in which, in the context of interpreting "intentional misconduct" in the contempt statute, WIS. STAT. § 785.01(1)(a), we stated that the legal definition of "intentional" is essentially the same, whether in tort law or criminal law, and we therefore used the definition in § 939.23(3).

to find with the requisite certainty that Lapham intentionally disregarded API's rights by concealing the punitive damages coverage under the primary policy; it is also sufficient for a reasonable jury to find Lapham was aware that ignoring the punitive damages claim for purposes of evaluation and refusing to settle the claim within the policy limits was practically certain to result in the disregard of API's right to be protected from an excess verdict.[7]

## ATTORNEY FEES

¶ 39. API moved post-verdict for an award of attorney fees.[8] It asked for $166,666.67—33 1/3% of the $500,000 awarded as compensatory damages for the bad faith claim—based on its contingent fee agreement with its attorneys, which it submitted as an exhibit. API argued it was entitled to its actual attorney fees as a component of damages on the bad faith claim. Alternatively, API argued that if the court decided it needed to evaluate the reasonableness of API's fees, the fees were reasonable under the factors set forth in SCR 20:1.5.[9] The trial court ruled API was entitled to attor-

_____

[7] We emphasize that we do not suggest an award of punitive damages follows automatically from a finding of bad faith; that is not the law. *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 697, 271 N.W.2d 368 (1978). Rather, in this case, evidence that supports the finding of bad faith also supports a finding of intentional disregard of API's rights.

[8] It appears API and Western National stipulated that if the jury found bad faith, the amount of attorney fees and costs was to be entered by the court post-verdict. We therefore do not consider the question of whether the jury or the court should determine the amount of attorney fees and costs to be awarded as a component of compensatory damages in a bad faith claim.

[9] SUPREME COURT RULE 20:1.5 in part provides:

ney fees as an element of damages and decided $166,666.67 was the amount that would make it whole.

¶ 40. Western National first contends the trial court erred in awarding attorney fees as an element of compensatory damages for the bad faith claim because this is a third-party bad faith claim, not a first-party bad faith claim. A resolution of this issue requires us to analyze *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d. 559, 547 N.W.2d 592 (1996), a first-party bad faith case, and *Majorowicz v. Allied Mut. Ins. Co.*, 212 Wis. 2d 513, 569 N.W.2d 472 (Ct. App. 1997), a third-party bad faith case. Whether an insured may recover attorney fees as damages presents a question of law, which we review de novo. *DeChant*, 200 Wis. 2d at 568.

¶ 41. In *DeChant*, the court held that the prevailing plaintiff in a first-party bad faith action was

Fees. (a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

entitled to recover attorney fees and bond premiums[10] as part of the compensatory damages resulting from the insurer's bad faith. *Id.* at 569–71. In doing so, the court rejected the contention that such recovery was barred by the American Rule, under which parties are generally responsible for their own attorney fees unless a contract or statute proves otherwise. The court reasoned that the insurer's bad faith forced the insured to retain an attorney to litigate his right to the policy benefits, and the fees thus incurred are an economic loss proximately caused by the tort of bad faith. The court recognized this conclusion was in conflict with an earlier decision, *Fehring v. Republic Ins. Co.*, 118 Wis. 2d 299, 347 N.W.2d 595 (1984). The *DeChant* court said: "[In *Fehring*] . . . we held that attorney's fees were not recoverable in bad faith actions by an insured against the insurer . . . . [A]ny language in *Fehring* contrary to our holding today is overruled." *DeChant*, 200 Wis. 2d at 576–77 (footnote omitted).

¶ 42. This court relied on *DeChant* in *Majorowicz*, in which the insured prevailed on a claim that the insurer had in bad faith failed to properly investigate, evaluate, negotiate, and communicate in handling a personal injury suit against the insured. We said:

> In *DeChant*, our supreme court decided that "when an insurer acts in bad faith by denying benefits, it is liable to the insured in tort for any damages which are the proximate result of that conduct," including attorney fees. *Id.* at 571. Allied's bad faith conduct exposed Majorowicz to an additional set of harms not covered by her policy. Unless Majorowicz is able

---

[10] The plaintiff had to post a bond to secure payment of disability benefits during the action.

to obtain relief in the form of attorney fees and other damages, the bad faith denial in not properly investigating, evaluating and properly communicating with her exposes her to numerous uncompensable harms. Allied's bad faith caused Majorowicz to incur legal expenses. If Allied had properly investigated, evaluated, and settled the claims, Majorowicz would not have had to seek the assistance of an attorney to represent her in the bad faith claim.[11] (Footnote added.)

*Majorowicz*, 212 Wis. 2d at 536.

¶ 43. Western National argues that *DeChant* overruled *Fehring* only with respect to first-party bad faith claims, and we therefore erred in applying it in *Majorowicz* to third-party bad faith claims. We reject this argument for two independent reasons. First, we are convinced we did not err in *Majorowicz* in applying the reasoning of *DeChant* to third-party bad faith actions. The court's reasoning in *Fehring* was based on a rationale—the American Rule—that is equally applicable to first-party and third-party bad faith actions, and the court's reasoning in *DeChant* in rejecting the application of the American Rule in first-party bad faith actions applies equally to third-party bad faith actions. Attorney fees an insured must pay to litigate a bad faith claim against an insurer are an economic loss proximately caused by the insurer's bad faith whether the insurance contract is one for disability benefits as

---

[11] In *Majorowicz v. Allied Mut. Ins. Co.*, 212 Wis. 2d 513, 536–37, 569 N.W.2d 472 (Ct. App. 1997), we also concluded that attorney fees incurred in proving punitive damages are not available as a component of compensatory damages for the bad faith claim. In this case API is seeking as attorney fees one-third of the award of compensatory damages only.

in *DeChant,* property casualty as in *Fehring,* or personal injury liability as in *Majorowicz.* Second, we are bound by our decision in *Majorowicz. Cook v. Cook,* 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997). We therefore conclude the trial court correctly ruled API could recover attorney fees as a component of its compensatory damages.

¶ 44. Western National next argues that, even if attorney fees are available as a component of compensatory damages in this action, API must nevertheless establish that the fees it incurred were reasonable and necessary, and its contingent fee agreement with its attorneys does not satisfy its burden. Western National relies on cases in which fees are awarded to a prevailing party under statutes that provide for an award of "reasonable attorney fees." *See, e.g., Standard Theatres, Inc. v. State Dept. of Transp.,* 118 Wis. 2d 730, 349 N.W.2d 661 (1984) ("litigation expenses" under WIS. STAT. § 32.28(1) are defined to include "reasonable attorney . . . fees necessary to prepare for or participate in actual or anticipated [condemnation] proceedings"); *Clark v. Aetna Fin. Corp.,* 115 Wis. 2d 581, 340 N.W.2d 747 (Ct. App. 1983) (WISCONSIN STAT. § 425.308(1) provides for a "reasonable amount for attorney's fees" for prevailing consumer in consumer transaction). Western National asserts that our standard of review on this issue is the same as that we employed in deciding whether an insured may recover attorney fees as a component of damages—de novo.

¶ 45. API responds that under *DeChant* and *Majorowicz,* it is entitled to its actual fees because that is the amount necessary to fully compensate for the damages caused by Western National's bad faith. API suggests that the cases requiring the prevailing party to establish that attorney fees are reasonable when a

607

statute provides for recovery of reasonable fees are not applicable. According to API, when attorney fees are a component of compensatory damages, the rule should be that it may recover the actual fees it incurred unless Western National shows those fees are unreasonable, which it has not done. Alternatively, API contends that if it must establish $166,667 was a reasonable attorney fee, doing so is a determination within the trial court's discretion and the record supports the trial court's decision. Western National does not reply to these arguments.

¶ 46. We will assume without deciding that API must establish that the attorney fees it incurred in litigating the compensatory damages for the bad faith claim were reasonable. API is correct that when a trial court decides what attorney fee is reasonable, we sustain the determination unless the trial court erroneously exercises its discretion. *Standard Theatres*, 118 Wis. 2d at 747. The reason for this deferential standard of review is that the trial court is in an advantageous position to observe the amount and quality of work performed and has the expertise to evaluate the reasonableness of the fees. *Id.* Trial courts properly exercise their discretion when they apply the correct law to the relevant facts and, through a rational process, reach a reasonable result. *Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37 (Ct. App. 1991).

¶ 47. The trial court did not explain its analysis of the reasonableness of the fees. However, we read the record to show the court found that the fees requested were fair and reasonable, in addition to being actually incurred. In its responsive brief, API develops a well-reasoned argument, applying the factors in SCR

20:1.5[12] to the facts available to the trial court. Because Western National does not reply to this argument, we conclude the trial court did not erroneously exercise its discretion,[13] and we affirm the award of the amount of fees.

## CROSS APPEAL—EXPERT WITNESS FEES

¶ 48. In addition to requesting attorney fees as a component of compensatory damages, API requested reimbursement for the fees of its two expert witnesses, which totaled $33,746.15, and travel and lodging costs for its attorneys in the amount of $3,815. Western National objected on the ground that API could recover only costs allowed by WIS. STAT. § 814.04, which limits expert fees to $100 for each expert witness plus the standard witness fee and mileage, § 814.04(2), and does not include travel expenses.[14] The trial court ruled it would allow as costs only those expert witness

---

[12] In *Standard Theatres, Inc. v. State Dept. of Transp.*, 118 Wis. 2d 730, 749, 349 N.W.2d 661 (1984), the court utilized the predecessor rule, SCR 20:12, to evaluate the trial court's determination on the reasonableness of attorney fees.

[13] When a party does not dispute a proposition of the respondent in its reply brief, we may take that as a concession. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994).

[14] WISCONSIN STAT. § 814.04(1) and (2) provide as follows:

**Items of costs.** Except as provided in ss. 93.20, 100.30(5m), 106.50(6)(i) and (6m)(a), 115.80(9), 769.313, 814.025, 814.245, 895.035(4), 895.10(3), 895.75(3), 895.77(2), 895.79(3), 895.80(3), 943.212(2)(b), 943.245(2)(d) and 943.51(2)(b), when allowed costs shall be as follows:

(1) ATTORNEY FEES. (a) When the amount recovered or the value of the property involved is $1,000 or over, attorney fees shall be $100; when it is less than $1,000 and is $500 or over, $50; when it is less than $500 and is $200 or over, $25; and when it is less than $200, $15.

fees authorized by statute, but did not elaborate on its reasoning.[15]

¶ 49. On cross-appeal, API contends the rationale in *DeChant* and *Majorowicz* supporting the award of attorney fees as a component of compensatory damages for a bad faith claim also supports the award of actual, as opposed to statutory, costs. Western National responds that *Kleinke v. Farmers Coop. Supply & Shipping*, 202 Wis. 2d 138, 549 N.W.2d 714 (1996), controls this issue and holds that a trial court does not have authority to allow costs that are not explicitly authorized by statute.

(b) When no money judgment is demanded and no specific property is involved, or where it is not practical to ascertain the money value of the rights involved, attorney fees under par. (a) shall be fixed by the court, but shall not be less than $15 nor more than $100.

(c) No attorney fees may be taxed on behalf of any party unless the party appears by an attorney other than himself or herself.

(2) DISBURSEMENTS. All the necessary disbursements and fees allowed by law; the compensation of referees; a reasonable disbursement for the service of process or other papers in an action when the same are served by a person authorized by law other than an officer, but the item may not exceed the authorized sheriff's fee for the same service; amounts actually paid out for certified copies of papers and records in any public office; postage, telegraphing, telephoning and express; depositions including copies; plats and photographs, not exceeding $50 for each item; an expert witness fee not exceeding $100 for each expert who testifies, exclusive of the standard witness fee and mileage which shall also be taxed for each expert; and in actions relating to or affecting the title to lands, the cost of procuring an abstract of title to the lands. Guardian ad litem fees shall not be taxed as a cost or disbursement. (Note omitted.)

[15] In its bill of costs, API included $116 for each of its two experts and then subtracted those sums from the experts' actual fees to arrive at the $33,746.15 requested.

¶ 50. In deciding this issue, we apply a de novo standard of review since the question of what damages a prevailing plaintiff in a bad faith claim may recover presents a legal issue, *see DeChant*, 200 Wis. 2d at 568, as does the question of what costs are allowed by statute, *see Kleinke*, 202 Wis. 2d at 147.

¶ 51. We agree with API that *Kleinke* is not controlling. In *Kleinke*, the court held that the trial court could not tax as costs either pretrial mediation fees or expenses incurred in photocopying medical records, exhibits, and appraisals, because such fees were not listed as items of costs in WIS. STAT. § 814.04(2), nor were they allowed as costs under any other applicable statute. *Kleinke*, 202 Wis. 2d at 147–48. The court rejected our statutory interpretation in *Zintek v. Perchik*, 163 Wis. 2d 439, 476–77, 471 N.W.2d 522 (Ct. App. 1991), *overruled on other grounds*, whereby we read § 814.04(2) together with WIS. STAT. § 814.036[16] and concluded that they grant the trial court complete discretion regarding what costs may be taxed against a party. *Kleinke*, 202 Wis. 2d at 148–49. It was in this context that the *Kleinke* court made the statement relied on by Western National: "[WIS. STAT. § 814.036], therefore, only gives the court discretion as to *when* it may allow costs, not as to *what* costs may be allowed. Neither [§ 814.036] . . . nor the catch-all provision in Wis. Stat. § 814.02 grants the trial court the power to allow costs which are not explicitly authorized by statute." *Id.* at 149.

---

[16] WISCONSIN STAT. § 814.036 provides:

Omnibus costs provision. If a situation arises in which the allowance of costs is not covered by ss. 814.01 to 814.035, the allowance shall be in the discretion of the court.

¶ 52. The *Kleinke* court addressed the question of what costs may be taxed when WIS. STAT. §§ 814.04 or 814.036 are relied upon; it did not consider or decide what costs may be recovered as a component of damages for the prevailing plaintiff in a bad faith claim. These are two distinct questions, as is apparent from *DeChant*. In *DeChant*, the court allowed as compensable damages the recovery of attorney fees actually incurred in litigating a bad faith action even though § 814.04(1) permits recovery of attorney fees of no more than $100 as an item of costs. Indeed, the court in *De Chant* rejected the insured's argument that bond premiums should not be construed as compensable damages because they could be recovered as a cost or disbursement under WIS. STAT. § 814.05.[17] *DeChant*, 200 Wis. 2d at 573 n.5.

██

¶ 53. We also agree with API that the reasoning of *DeChant* is not limited to attorney fees. First, as a factual matter the court in *DeChant* allowed recovery of the bond premium in addition to attorney fees. The bond premium was an expense the plaintiff incurred in the litigation of the bad faith claim as a result of the insured's bad faith denial of its claim. Second, the *De Chant* court's rationale—that the plaintiff should be able to recover for the economic loss proximately caused by the insurer's tort—applies to litigation expenses in addition to those incurred in retaining an attorney. We can discern no principle upon which to distinguish between attorney fees and other expenses

---

[17] WISCONSIN STAT. § 814.05 provides:

**Bond premium as costs.** Any party entitled to recover costs or disbursements in an action or special proceeding may include in such disbursements the lawful premium paid to an authorized insurer for a suretyship obligation.

incurred in litigating a bad faith claim, and Western National suggests none. We therefore conclude that a prevailing plaintiff in a bad faith action may recover as compensatory damages all reasonable expenses incurred in litigating the bad faith claim. Because Western National does not argue that the expenses for API's expert witnesses and for its attorney's travel and lodging were not reasonable, we conclude the trial court erred in not allowing these expenses as a component of API's compensatory damages.

## SUMMARY

¶ 54. We affirm the judgment except insofar as the trial court did not allow the expert witness fees and travel costs in the amount of $37,561.15 as a component of compensatory damages. We therefore affirm in part; reverse in part and remand with directions to the trial court to modify the judgment accordingly.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.