Patricia WISCHER, individually, and as Special Administrator of the Estate of Jeffrey A. Wischer, deceased, Marjorie DeGrave, individually, and as Special Administrator of the Estate of William R. DeGrave, deceased, and Ramona Dulde-Starr, individually, and as Special Administrator of the Estate of Jerome W. Starr, deceased, Plaintiffs-Intervenors-Respondents-Petitioners,

v.

MITSUBISHI HEAVY INDUSTRIES AMERICA, INC., Defendant-Appellant,

The TRAVELERS INDEMNITY COMPANY OF ILLINOIS, Defendant,

NEIL F. LAMPSON, INC., Defendant-Respondent,

LAMPSON INTERNATIONAL LTD., Federal Insurance Company, and The Tokio Marine & Fire Insurance Company, Defendants.

Patricia WISCHER, individually, and as Special Administrator of the Estate of Jeffrey A. Wischer, deceased, Marjorie DeGrave, individually, and as Special Administrator of the Estate of William R. DeGrave, deceased, and Ramona Dulde-Starr, individually, and as Special Administrator of the Estate of Jerome W. Starr, deceased, Plaintiffs-Respondents-Cross-Respondents-Petitioners,

v.

4

MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.,
Defendant-Respondent-Cross-Appellant,

The TRAVELERS INDEMNITY COMPANY OF ILLINOIS,
Defendant-Appellant,

NEIL F. LAMPSON, INC. and Lampson International
Ltd., Defendants,

FEDERAL INSURANCE COMPANY,
Defendant-Co-Appellant,

The TOKIO MARINE & FIRE INSURANCE COMPANY,
Defendant.

Patricia WISCHER, individually, and as Special
Administrator of the Estate of Jeffrey A. Wischer,
deceased, Marjorie DeGrave, individually, and as
Special Administrator of the Estate of William R.
DeGrave, deceased, and Ramona Dulde-Starr,
individually, and as Special Administrator of the
Estate of Jerome W. Starr, deceased, Plaintiffs-
Respondents-Cross-Respondents-Petitioners,

v.

MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.,
Defendant-Respondent-Cross-Appellant,

The TRAVELERS INDEMNITY COMPANY OF ILLINOIS,
Defendant-Appellant-Cross-Respondent,

NEIL F. LAMPSON, INC. and Lampson
International Ltd., Defendants,

FEDERAL INSURANCE COMPANY and The Tokio Marine
& Fire Insurance Company, Defendants-
Respondents-Cross-Appellants.

5

■■■■■■■■■■■■

■■■■■■■■■■■■■

Supreme Court

*Nos. 01–0724, 01–1031, and 01–2486. Oral argument October 28, 2004.—Decided March 18, 2005.*

■■■■■■■■■■■

**2005 WI 26**

(Also reported in 694 N.W.2d 320.)

■■■■■■

■■■■■■■■■■■

■■■■■■■■■

■■■■■■■■■■■■

6

For Patricia Wischer, Marjorie DeGrave and Ramona Dulde-Starr there were briefs by *Robert L. Habush, Daniel A. Rottier, Mark S. Young, Virginia M. Antoine* and *Habush Habush & Rottier, S.C.,* Milwaukee, and *David P. Lowe* and *Jacquart & Lowe, S.C.,* Milwaukee, and oral argument by *Robert L. Habush.*

For Mitsubishi Heavy Industries America, Inc., there were briefs by *Ralph A. Weber, Amelia L. McCarthy* and *Gass Weber Mullins, LLC,* Milwaukee; *John W. Bell, Kevin G. Owens* and *Johnson & Bell, Ltd.,* Chicago, IL; and *Colleen D. Ball* and *Appellate Counsel, S.C., Wauwatosa,* and oral argument by *Ralph A. Weber.*

For The Travelers Indemnity Company of Illinois, there were briefs by *Brady C. Williamson, Katherine Stadler, Jennifer L. Peterson* and *LaFollette Godfrey & Kahn,* Madison, and oral argument by *Brady C. Williamson.*

For Federal Insurance Company, Inc., there was a brief by *John A. Busch, Christopher C. Mohrman, Timothy M. Hansen,* and *Michael Best & Friedrich, LLP,* Milwaukee and *Edward B. Ruff III, Michael Clarke* and *Pretzel & Stouffer, Chartered,* Chicago, IL, and oral argument by *John A. Busch.*

For Tokio Marine & Fire Insurance Company, there was a brief by *Jeffrey S. Fertl* and *Hinshaw & Culbertson LLP,* Milwaukee.

8

An amicus curiae brief was filed by *James A. Buchen*, Madison, on behalf of Wisconsin Manufacturers & Commerce.

An amicus curiae brief was filed by *Eric Englund*, Madison, on behalf of Wisconsin Insurance Alliance.

An amicus curiae brief was filed by *Bruce R. Bachhuber* and *Hanaway Ross, S.C.*, Green Bay; and *William C. Gleisner, III*, Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *Matthew R. Robbins, Hope K. Olson* and *Previant, Goldberg, Uelmen, Gratz, Miller & Bruggeman, S.C.*, Milwaukee, on behalf of Wisconsin State AFL-CIO, Milwaukee Building & Construction Trades Council, and Wisconsin Teamsters Joint Council 39.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of a published decision of the court of appeals affirming in part and reversing in part a judgment of the Circuit Court for Milwaukee County, Dominic S. Amato, Judge.[1]

¶ 2. Patricia Wischer, Marjorie DeGrave, and Ramona Dulde-Starr sued individually and as special administrators of their deceased husbands' estates. Their husbands died during the construction of the retractable roof of the Miller Park baseball stadium in Milwaukee, Wisconsin. The defendants were Mitsubishi

---

[1] Three cases were consolidated in the "Miller Park" appeals, *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2003 WI App 202, ¶ 1, 267 Wis. 2d 638, 673 N.W.2d 303.

Because the court did not reach the issue of whether the punitive damage award in this case was unconstitutional, plaintiffs' motion to strike portions of MHIA's supplemental brief and appendix and to strike Federal Insurance Company's brief on constitutional issues is moot.

Heavy Industries America, Inc. (MHIA) and others[2] involved in the construction. At the conclusion of the trial, the jury found that MHIA had acted "in an intentional disregard of the rights of the plaintiff[s]." The circuit court entered judgment against MHIA for punitive damages in the amount of $84,625,000.[3]

---

[2] The original complaint listed the following defendants: Mitsubishi Heavy Industries America, Inc.; Travelers Property Casualty Insurance Co.; The Travelers Indemnity Company of Illinois; Neil F. Lampson, Inc.; HCH Miller Park Joint Venture; Hunzinger Construction Co.; Clark Construction Builders, Inc. (renamed in the first amended complaint as The Clark Construction Group, Inc.); and Huber, Hunt & Nichols, Inc. In the first amended complaint Mitsubishi Heavy Industries, Ltd. and Lampson International, Ltd. were added as defendants. In the second amended complaint the defendants were listed as: Mitsubishi Heavy Industries America, Inc.; Travelers Property Casualty Insurance Co.; The Travelers Indemnity Co. of Illinois; Lampson International Ltd.; Indemnity Insurance Co. of North America; Federal Insurance Co.; and The Tokio Marine and Fire Insurance Co.

[3] The jury awarded punitive damages of $94 million, but as a result of a settlement agreement, MHIA's exposure to punitive damages was capped at this lower figure.

The parties in this case entered into a series of settlement agreements, both before and during the trial. The effect of these agreements was that Travelers Indemnity and Royal Insurance would pay the plaintiffs $7 million, and MHIA and Indemnity Insurance Company would make an immediate payment to the plaintiffs of $12,375,000 to be credited against any compensatory damages award by the jury. The mid-trial (and secret) agreement between plaintiffs, MHIA, and Indemnity Insurance Company also provided that punitive damages would be capped at $84,625,000 if it were later determined that MHIA had insurance coverage. If MHIA did not have insurance coverage, punitive damages would be capped at $10 million. The scope of coverage and the effect of these agreements on the jury's award

¶ 3. The court of appeals reversed the judgment on punitive damages. This review involves only the judgment for punitive damages against MHIA and its insurers.[4] The plaintiff may receive punitive damages under Wis. Stat. § 895.85(3) (1999–2000)[5] "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."

¶ 4. Three questions of law are presented for review:

(1) Is the court of appeals correct in interpreting Wis. Stat. § 895.85(3) to mean that a defendant must intend to cause injury to the plaintiffs or have knowledge that its conduct was practically certain to cause the accident or injury to the plaintiffs?[6]

were issues presented to the court of appeals, but those issues are not presented in this review and remain unresolved.

[4] The court of appeals affirmed the judgment of the circuit court for compensatory damages. Compensatory damages are not at issue in this review.

Initially, this court granted review and limited the issue to: "What proof is required for a plaintiff to recover punitive damages under the phrase 'in an intentional disregard of the rights of the plaintiff' as provided in Wis. Stat. § 893.85(3)?" In response to a request by Travelers Indemnity Company of Illinois to intervene in *Strenke v. Hogner*, 2005 WI 25, 279 Wis. 2d 52, 694 N.W.2d 296, this court expanded review in this case to "whether the punitive damage award in this case is unconstitutional." The parties provided supplemental briefing on this issue.

[5] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

[6] Interpretation of Wis. Stat. § 895.85(3) is a question of law that this court decides independently of both the circuit court

(2) Was the evidence sufficient to submit a punitive damages award question to the jury?[7]

(3) If there was sufficient evidence to submit a punitive damages award question to the jury, is the jury's punitive damages award in the amount of $94 million excessive and in violation of MHIA's due process rights?

¶ 5. We respond to these questions as follows:

¶ 6. (1) The court of appeals erroneously interpreted Wis. Stat. § 895.85(3). In *Strenke v. Hogner*, mandated on the same date as this opinion, this court has overruled the court of appeals' interpretation of Wis. Stat. § 895.85(3) set forth in its decision in the instant case.[8] The court of appeals interpreted § 895.85(3) in the instant case as follows: "[t]he phrase 'intentional disregard of the rights of the plaintiff' in Wis. Stat. § 895.85(3) can only be reasonably interpreted to require either an intent by a defendant to cause injury to the plaintiffs or knowledge that the defendant's conduct was practically certain to cause the accident or injury to the plaintiffs."[9]

---

and court of appeals, benefiting from their analyses. *Strenke v. Hogner*, 2005 WI 25, ¶ 13, 279 Wis. 2d 52, 694 N.W.2d 296.

[7] The sufficiency of the evidence to submit the question of punitive damages to the jury is a question of law that this court decides independently of both the circuit court and court of appeals, benefiting from their analyses. *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 13.

[8] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 34; *Wischer*, 267 Wis. 2d 638.

[9] *Wischer*, 267 Wis. 2d 638, ¶ 5. Although the defendants initially appealed 18 issues to the court of appeals, the court of appeals addressed only the interpretation of Wis. Stat. § 895.85(3) relating to punitive damages. The court of appeals concluded that its interpretation of § 895.85(3) was dispositive,

¶ 7. We concluded in *Strenke v. Hogner* that the requirement in Wis. Stat. § 895.85(3) that the defendant act " 'in an intentional disregard of the rights of the plaintiff' necessitates that the defendant act with a purpose to disregard the plaintiff's rights or be aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded."[10] Accordingly, we conclude that Wis. Stat. § 895.85(3) requires a plaintiff to show that a defendant acted maliciously to the plaintiff or intentionally disregarded the rights of the plaintiff, not that a defendant intended to cause harm or injury to the plaintiff.

¶ 8. (2) We conclude that the evidence was sufficient to submit a punitive damages award question to the jury. The jury could have believed that the crane collapsed, as the plaintiffs claimed, because it was used in high winds, no wind-speed calculations were made, and the crane's load chart limitations were exceeded; without wind calculations the 45–stories-high crane was lifting a billboard-size load of nearly one million pounds on a windy afternoon. One need not be an engineer or have heard all the evidence about the maximum safe wind speed and load limitations for operating this gigantic crane as it lifted this gigantic load on a windy day to know that wind plays an important factor in maneuvering objects outdoors. Anyone who has hung wet laundry, set up an outdoor art display, or driven a motor vehicle on a high bridge knows the havoc wind can play with items light or heavy. A reasonable jury could find that the plaintiffs had proved by the middle burden of proof, "clear and

---

rendering the other issues moot, and did not address the other issues. *Wischer,* 267 Wis. 2d 638, ¶ 1.

[10] *Strenke v. Hogner,* 279 Wis. 2d 52, ¶ 36.

convincing evidence," that MHIA acted in an intentional disregard of the rights of the plaintiffs, that is, that MHIA was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded.

¶ 9.　(3) We decline to address the issue of the constitutionality of the amount of the punitive damages award because numerous issues remain unresolved and are not before us. Some of those issues may affect a constitutional analysis under *Trinity Evangelical Lutheran Church v. Tower Insurance Co.*,[11] *State Farm Mutual Automobile Insurance Co. v. Campbell*,[12] and *BMW of North America, Inc. v. Gore*.[13] For example, was MHIA entitled to offer evidence of its net worth for the jury to consider in deciding the amount of punitive damages? What effect does the secret settlement agreement between the plaintiffs and MHIA have on the potential exposure for both MHIA and its insurers?

¶ 10.　Given the nature of the outstanding issues, we decline to address the constitutionality of the $94 million award at this time.

¶ 11.　Accordingly, we reverse the decision of the court of appeals that reversed the judgment of the circuit court awarding punitive damages and remand the cause to the court of appeals for resolution of the remaining and as yet unresolved issues.

## I

¶ 12.　The basic tragic facts can be stated simply. Three ironworkers, Jeffrey Wischer, William DeGrave, and Jerome Starr, fell to their deaths at approximately

---

[11] 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789.

[12] 538 U.S. 408 (2003).

[13] 517 U.S. 559 (1996).

5:14 p.m. on July 14, 1999. They were working at Miller Park stadium, the future home of the Brewers, Milwaukee's major league baseball team. The three men were in a basket held by a crane, preparing to bolt down a section of Miller Park's retractable roof that was being hoisted into place by the large "Big Blue" crane. As Big Blue moved the enormous piece of roof into place, Big Blue collapsed. Big Blue's boom hit the crane holding the men and the men fell to their deaths.[14]

¶ 13. The construction of Miller Park involved hundreds of contractors and subcontractors. The task of building the stadium's state-of-the-art retractable roof was contracted to MHIA. Although another contractor designed the roof, MHIA was responsible for installing it, along with the drive system that would move its panels. The panels are designed to open and close, thereby allowing baseball games to be played outdoors in nice weather and functionally indoors during inclement weather. Danny's Construction Company, Inc. had the contract to bolt the stadium roof into place. The three deceased ironworkers worked for Danny's Construction.

¶ 14. The retractable roof is made up of a number of large panels. The panels were lifted into place one at a time. The panel lifted on July 14th, labeled 4R3, was the largest of all the panels. It had an approximate weight of 913,000 pounds and the approximate dimensions of a billboard, 120 feet wide and 76 feet high.[15] The weight was represented as the equivalent of 285

---

[14] The parties still dispute exactly what caused Big Blue to collapse. This section contains a number of the undisputed facts, while the remaining relevant facts are contained in the sections to follow.

[15] R.730:121.

Ford Taurus automobiles; the dimensions are similar to 3$^{1}$/$_{2}$ Boeing 747 airplane wings.[16]

¶ 15. Obviously, moving a panel of this size required a crane equal to the task. For this purpose, Mitsubishi Heavy Industries leased a very large crane, the Transilift 1500 Series IIIA, from Lampson International.[17] The Transilift 1500, a/k/a "Big Blue," was designed and built by Neil F. Lampson, a British crane designer and manufacturer.

¶ 16. Big Blue was a special crane. It was forty-five stories high. It was not only huge and capable of lifting large loads, but it also was ambulatory by virtue of the two crawlers upon which it sat. The crane could thus pick up a load in one spot and move the load across the ground for placement by the boom and jib.[18] But being big and mobile came at a price. The specifications for the slope and firmness of the ground upon which the crane sat and moved were exacting.

¶ 17. The crane was shipped to the site and assembled by a crew supplied by Lampson International. Lampson International also provided a crew for the operation of the crane. Fred Flowers was the crane operator; Alan Watts was the flagger and supervisor for the Lampson crew.[19]

---

[16] R.730:121.

[17] The actual lease calls for the delivery of a Transilift 1200 Series IIA crane, but Lampson International provided the Transilift 1500 Series IIIA crane.

[18] "The boom is the long lattice arm extending from the plastic bearing. At the end of the boom is a joint, and extending beyond the joint is a shorter lattice called the jib. Any load carried by the crane hangs from the jib." *Wischer,* 267 Wis. 2d 638, ¶ 12. For a succinct description of the crane in question, see *Wischer,* 267 Wis. 2d 638, ¶ 12.

[19] *Wischer,* 267 Wis. 2d 638, ¶ 13.

¶ 18. Overall construction of, and responsibility for, the roof of the stadium remained in MHIA's control; Victor Grotlisch was MHIA's site manager and Wayne Noel was MHIA's safety superintendent.[20] At trial the plaintiffs focused on Grotlisch's conduct prior to the event, on the day of the event, and after the event. Suffice it to say, the plaintiffs attempted to paint Grotlisch as an arrogant, intimidating, on-site supervisor who routinely disregarded workers' safety. The plaintiffs further alleged that in the wake of the accident Grotlisch tried to cover up a potential cause for the accident, which, according to the plaintiffs, was his failure to ensure that wind-speed calculations were made and factored into the lift plan.

¶ 19. Construction generally, and the placement of this roof particularly, were dangerous undertakings. Recognizing this fact, the owner of the stadium, Southeast Wisconsin Professional Baseball Park District, arranged for extensive, layered commercial general liability insurance policies to cover Miller Park's construction.[21] Five different insurers provided six different layers of coverage.[22]

---

[20] Throughout this opinion the acts or failure to act of MHIA employees is discussed, including that of Grotlisch and Noel. As employees of MHIA, their behavior is attributable to MHIA. We use MHIA and the employees' names interchangeably with respect to the conduct that triggered MHIA's liability in this case.

[21] The layered coverage was called the Owners Controlled Insurance Program. Layered coverage means that the insurance policies are paid off in order of priority. In the event of a claim, the insurance company first in line of priority pays first. Only after that policy has been exhausted will the insurance company second in line be required to pay.

[22] "The priority for the coverage under the [Owners Controlled Insurance Program] was as follows:

17

¶ 20. At the conclusion of the trial, the jury returned a compensatory damage verdict of $5.25 million and a punitive damage award of $94 million against MHIA.

¶ 21. The preceding facts are background. More detailed facts relating to the lifting and placement of the roof will be discussed below in relation to the analysis of whether the evidence was sufficient to submit the punitive damage award question to the jury.

## II

¶ 22. We turn first to the question of the correct interpretation of the phrase, "in an intentional disregard of the rights of the plaintiff," in Wis. Stat. § 895.85(3).[23] The court heard both the instant case and *Strenke v. Hogner* on the same day. Both cases focus on the interpretation of this phrase.

¶ 23. The court of appeals concluded in its decision in the instant case that "in an intentional disregard

| | |
|---|---|
| The Travelers Indemnity Company of Illinois | $2,000,000 |
| Royal Insurance Company of America | $5,000,000 |
| Indemnity Insurance Company of North America | $20,000,000 |
| Federal Insurance Company | $50,000,000 |
| The Travelers Indemnity Company of Illinois | $25,000,000 |

The Tokio Marine & Fire Insurance Company $2,000,000 in separate coverage for MHIA, attaches at $75,000,000." *Wischer,* 267 Wis. 2d 638, ¶ 16.

[23] Wisconsin Stat. § 895.85(3) reads: "STANDARD OF CONDUCT. The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."

18

of the rights of the plaintiff" means that "a defendant was unambiguously required to have (1) a general intent to perform an act, and (2) either (i) a specific intent to cause injury by that act or (ii) knowledge that the act is practically certain to result in injury."[24]

¶ 24. The court of appeals' reading of Wis. Stat. § 895.85(3) in its decision in the instant case is erroneous and was overruled in *Strenke v. Hogner*.[25] The correct interpretation of the statute is set forth in this court's majority opinion in *Strenke v. Hogner*: "Notably, there is no requirement of intent to injure or cause harm in the [jury] instruction. Rather, the focus is on the disregard of rights."[26] We concluded in *Strenke v. Hogner* that "[t]he legislature did not intend an 'intentional disregard of the rights of the plaintiff' to require 'intent to cause injury to the plaintiff.' "[27] In *Strenke v. Hogner* we explained the proper interpretation of the statute as follows:

> [T]he statute's requirement that the defendant act 'in an intentional disregard of the rights of the plaintiff' necessitates that the defendant act with a purpose to disregard the plaintiff's rights or be aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded.[28]

---

[24] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 17 (citing *Wischer*, 267 Wis. 2d 638, ¶ 40).

[25] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 34.

[26] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 37.

[27] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 19.

[28] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 36. *Strenke* went on to state, at 279 Wis. 2d 52, ¶ 38:

> [W]e conclude that a person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard

¶ 25. The interpretation of the statute set forth in *Strenke v. Hogner* is consistent with the explanation of the statute set forth in Wisconsin Civil Jury Instruction 1707.1, the instruction given in the present case.[29]

¶ 26. Pursuant to *Strenke v. Hogner,* we conclude that the court of appeals erred in its interpretation of Wis. Stat. § 895.85(3) and that the circuit court's instructions to the jury on "intentional disregard of the plaintiffs' rights" were proper.

## III

¶ 27. The next question is whether the evidence is sufficient to warrant submission of the question of a punitive damages award to the jury.

¶ 28. The court of appeals concluded that submission of the award of punitive damages to the jury was improper inasmuch as the plaintiffs conceded in their post-verdict motion for summary judgment against Federal Insurance Co.[30] that no evidence was presented

---

the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded. This will require that an act or course of conduct be deliberate. Additionally, the act or conduct must actually disregard the rights of the plaintiff, whether it be a right to safety, health or life, a property right, or some other right. Finally, the act or conduct must be sufficiently aggravated to warrant punishment by punitive damages.

[29] *See Strenke v. Hogner,* 279 Wis. 2d 52, ¶ 37. Wis JI—Civil 1707.1 reads as follows: "A person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights or is aware that his or her acts are practically certain to result in the plaintiff's rights being disregarded."

[30] *Wischer,* 267 Wis. 2d 638, ¶ 5.

that the defendant intended to injure them. The circuit court made the same finding.[31]

¶ 29. The court of appeals erred, as we have previously explained, in interpreting Wis. Stat. § 895.85(3) to require proof that the defendant intended to injure the plaintiffs. Rather, the focus in § 895.85(3) is on the intentional disregard of rights.

¶ 30. According to *Strenke v. Hogner*, a defendant's act or course of conduct must be deliberate. A defendant must be aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded—the rights of the plaintiff to safety, health, or life, a property right, or some other right. Furthermore, the course of conduct must actually disregard the rights of the plaintiff. Finally, the act or course of conduct must be sufficiently aggravated to warrant punishment by a punitive damages award.[32]

¶ 31. We therefore must determine whether the evidence presented to the jury is sufficient, under a correct interpretation of the statute, to demonstrate an intentional disregard of the rights of the plaintiffs to warrant submission of a punitive damages award question to the fact finder.[33] On this question, a reviewing court must make sure that the circuit court properly performed its gate-keeping function by ensuring the sufficiency of the evidence. Punitive damages are not recoverable if a wrongdoer's conduct is merely negligent. Only when the wrongdoer's conduct is so aggravated that it meets the elevated standard of an "inten-

---

[31] R.886:18.

[32] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 38.

[33] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 42; *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 298, 294 N.W.2d 437 (1980).

tional disregard of rights" should a circuit court send the issue of punitive damages to a jury.[34]

■

¶ 32. Whether there was sufficient evidence to submit the question of a punitive damages award is a question of law that this court reviews independently of the circuit court and the court of appeals, benefiting from their analyses.[35]

¶ 33. After examining the conduct of MHIA employees, the circuit court concluded that the evidence was sufficient to submit the question of a punitive damages award to the jury under its correct interpretation of the statute.[36] The circuit court reasoned as follows:

> All the plaintiff has to do at this stage of the proceedings is show a prima facie case. He doesn't have to do anything other than present competent evidence that would support a prima facie case under the appropriate burden of proof. The testimony on this subject could only be invaded . . . if it was inherently incredible or inherently implausible, and the [testimony here is not inherently incredible or inherently implausible.]
>
> Setting aside the testimony of the experts on this subject and the references that some of experts testified, such as Mr. Shapiro [the plaintiffs' crane expert], just setting that aside, the evidence offered by the

[34] *Strenke v. Hogner,* 279 Wis. 2d 52, ¶ 42.

[35] *Strenke v. Hogner,* 279 Wis. 2d 52, ¶ 13; *Loveridge v. Chartier,* 161 Wis. 2d 150, 187–88, 468 N.W.2d 146 (1991) ("Whether there is sufficient evidence to submit the question of punitive damages to the jury is a question of law which this court independently reviews.").

[36] R.732:255–57.

people there working at Miller Park, along with the admissions by Mr. Grotlisch, Mr. Noel, that in and of itself rises to the level of the plaintiff establishing a prima facie case for the allowance of punitive damages. I don't have to reach the testimony of the experts. I don't want to get involved in their descriptive phraseology of what is or what is not. I know there was testimony by some of the experts as to a conscious disregard. The court doesn't have to reach that because there's enough evidence in the record to show not only a conscious disregard but an intentional disregard of the rights of plaintiffs in this case.[37]

¶ 34. The relevant question for this court is whether the evidence, if believed by the jury, was sufficient so that a reasonable jury could find that the plaintiffs had proved by the middle burden of proof, "clear and convincing evidence," that MHIA was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded.[38]

¶ 35. We now turn to an examination of the relevant facts. The record in this case is extensive. The trial transcripts alone exceed 7,800 pages. The jury heard from a multitude of witnesses and saw hundreds of exhibits. The parties disagreed about what caused Big Blue to collapse. We are satisfied, as was the circuit court, that the evidence presented, if believed by the jury, was sufficient to support the submission of the punitive damage award question to the jury. Indeed MHIA conceded that if the plaintiffs' interpretation of Wis. Stat. § 895.85(3) is correct, the evidence is sufficient to go to

[37] R.732:255–56.
[38] *Strenke v. Hogner,* 279 Wis. 2d 52, ¶¶ 36, 38, 54.

the jury.[39] We are, however, not bound by this concession.[40]

¶ 36. The plaintiffs claim that the crane collapsed because it was used in high winds, no wind-speed calculations were made, and the crane's load chart limitations were exceeded.

¶ 37 Wind is a significant consideration for crane operators. Wind creates intense pressure on the central pin that connects the boom to the base of the crane.[41] Howard Shapiro, the plaintiffs' crane expert, testified about the effect of wind as follows:

> The wind acts against each and every piece of the crane exerting a pressure against it, and it causes a boom to bend slightly in the direction away from the wind. If there's a load on the hook, the wind will blow on that load and exert a force on that load. And the only connect between a load on the crane and the crane itself is the hoist line. So whatever force wind exerts on the load travels up the hoist line and into the crane at the very top of the crane where the hoist line is attached.[42]

The central pin, or "king pin," failed, according to the plaintiffs' evidence, because the wind on the load trans-

[39] MHIA's Initial Court of Appeals Brief at 25 ("If the trial court's and the plaintiffs' rendition of the statute is accurate, then it was appropriate to allow the jury to consider punitive damages.").

[40] *State v. Gomaz*, 141 Wis. 2d 302, 307, 414 N.W.2d 626 (1987) ("[T]he state's retraction of its position . . . is a concession regarding a question of law which this court is not bound to accept.").

[41] R.731:156.

[42] R.731:126–27.

mitted force on the very top of the crane in a concentrated manner that was then transferred to the very base of the crane.[43]

¶ 38. Given the effect of wind on a crane, the crane comes with a load chart that places limits on the crane's use. The load chart "is really the main communication between the manufacturer of the crane and the users of the crane. It tells you what the crane is capable of doing, and it sets up the limitations on the use of the crane. And those are just the necessary things that you have to deal with to use a crane safely."[44]

¶ 39. The load chart in this case stated that Big Blue's maximum safe wind speed was 20 mph, regardless of the load.[45] Shapiro testified that Big Blue's load chart meant "that no matter what you're doing with this crane, if you're going to be lifting loads, 20 miles per hour is the maximum wind speed that you can permit during that operation or that you can conduct that operation in."[46] According to Shapiro, as the dimensions of the load increase, the maximum safe wind speed should be reduced.[47] The limitations set forth in the load chart are supposed to be factored in with considerations such as the load weight and dimensions, the wind speed, and other conditions to form a "lift plan."[48] Shapiro testified that the lift plan in this case was completely inadequate and that the failure to do wind-sail calculations, that is, the effect of the wind on the

---

[43] R.731:155–56.

[44] R.731:128.

[45] R.731:129.

[46] R.731:129.

[47] R.731:128–40, 155–56.

[48] R.731:133.

load, was a violation of industry standards, OSHA standards, and the load chart.[49]

¶ 40. Evidence showed that MHIA was responsible for using wind calculations and that Grotlisch was in charge of lift operations. According to Grotlisch's testimony, he was aware that tragedy might well result from lifting a piece of the roof as large as 4R3 if there was a failure to do wind-speed calculations to determine if it was safe to lift.[50] Grotlisch unequivocally admitted on direct examination his awareness of the importance of the wind:

> Q: You also told me [counsel for plaintiffs], Mr. Grotlisch, that if wind speeds reached 20 miles per hour with gusts up to 26 miles per hour, any attempt to lift 4R3 would be unsafe?
>
> A: I believe we discussed that [at a prior deposition].
>
> Q: I know we discussed it, but I want you to, if you could, sir, tell me whether or not you remember it or you agree that that's what you told me.
>
> A: I believe I told you that and agreed to that.[51]
>
> . . . .
>
> Q: You also told me, did you not, Mr. Grotlisch, that when you proceed with a lift at Miller Park, due to variable winds, the topography, the size of 4R3, the size

---

[49] R.731:133, 140.

[50] R.727:41. In order to know the maximum safe wind speed in which the crane could be operated, the person uses a mathematical equation with the dimensions of the piece being lifted, as well as its weight. This equation generates the maximum safe wind speed in which that particular load can be lifted. It will always be equal to or lower than the maximum safe wind speed, 20 mph, for the crane. R.727:42.

[51] R.727:41.

of the crane, without doing the calculations of the effect of the wind on the load, that this could be a dangerous practice?

. . . .

A: Yes.

. . . .

Q: It could lead to the crane tipping over; isn't that an effect?

A: That's an effect.

Q: And it could also be a dangerous practice because it could fall over and kill people; isn't that also true?

A: Correct.

Q: People such as the plaintiffs?

A: That is correct.

Q: You were reasonably certain, were you not, prior to July 14th, 1999 that if these wind load calculations were not being done with a piece the size of 4R3, that not only was it a dangerous practice, but there was a probability that a tragedy could occur?

A: That is correct.[52]

¶ 41. In addition to hearing that Grotlisch was aware of the dangers, the jury also heard evidence that neither Grotlisch nor anyone associated with MHIA or Lampson International used wind-speed calculations to determine the maximum safe wind speed in which pieces of the roof could be lifted.[53] Again, on direct examination Grotlisch testified as follows:

_____

[52] R.727:41–49.
[53] R.727:49.

Q: . . . You told me, did you not, in your January deposition that on the 14th, when 4R3 was being lifted, you had no idea what effect the wind might have on the load as to how it might affect the crane.

A: Correct.

. . .

Q: You knew that wind speed studies addressed the effects that wind would have on a suspended load with respect to whether it could overturn the crane?

A: Yes.[54]

The jury heard that despite this awareness of the need for wind-speed calculations, the danger of conducting a lift without the calculations, and the potential for tragedy, Grotlisch failed to ask for wind speeds and failed to incorporate any wind speeds into determining whether the lift of 4R3 could be conducted safely.

¶ 42. Grotlisch testified that he knew the maximum safe wind for Big Blue was 20 mph.[55] Additionally, the lease from Lampson International provided that the crane could not be operated in winds in excess of 20

Q: Now you told me, Mr. Grotlisch, in that connection that it was your responsibility that if you knew no one at Mitsubishi was doing these calculations, you were unsure if Lampson was doing these calculations, that it was your responsibility to ask[,] Did you do them?

. . . .

A: Yes.

Q: You didn't, did you?

A: No, I did not.

[54] R.727:49–50.
[55] R.727:40.

28

mph.[56] The lease also provided that this limit did not reflect the effect different weights and dimensional loads might have on the crane's limits, and Grotlisch testified that he was aware of this fact.[57]

¶ 43. Grotlisch did not need the lease to tell him that the dimensions of the load affected the maximum safe lift speed. Grotlisch had conducted 50 lifts with other cranes at other construction sites. He was aware of the need to use wind-speed calculations for a safe lift and had used wind-speed calculations in these prior lifts.[58]

¶ 44. The plaintiffs' primary crane expert, Shapiro, called Grotlisch's failures "unconscionable."[59] "The behavior on the 14th I feel was unconscionable. I don't really understand how Mr. Grotlisch would have permitted that operation to go forward in the face of those winds."[60] Shapiro characterized the failure to use wind-speed calculations the "most callous and outrageous disregard of workers' safety that [he had] ever experienced . . . where someone [had] been injured or killed."[61] The jury could have agreed with Shapiro that Grotlisch was "playing Russian Roulette" with the lives of those at the stadium that day, except, as Shapiro noted, "his own."[62] Shapiro explained that on each of the

---

[56] R.724:206–212.

[57] R.727:42.

[58] R.727:37.

[59] R.731:175.

[60] R.731:175.

[61] R.731:175–76.

[62] R.731:120. Russian Roulette is a "stunt in which one spins the cylinder of a revolver loaded with only one bullet, aims the muzzle at one's head, and pulls the trigger." American Heritage Dictionary 1581 (3d ed. 1992).

previous nine times a piece of the roof was lifted without factoring the wind speed, Grotlisch and MHIA got lucky. When the 4R3 was lifted, however, their luck ran out.

¶ 45. Shapiro was not the only witness who questioned the wisdom of lifting under these conditions. An elevator operator employed by HCH Miller Park Joint Venture, Heinz Zeitler, testified that just before the accident he told an MHIA employee, Harumi Saeki, that "I thought they were crazy for making the lift [because of the wind conditions]" and that the winds were getting worse in the afternoon, not better.[63]

¶ 46. After doing the calculations of wind and load that Grotlisch should have done or had done for him, Shapiro determined that the maximum safe wind speed for lifting panel 4R3 was 11.5 mph.[64] Witnesses agreed that the tragedy would have been averted had the lift been performed in winds of 11.5 mph.[65]

¶ 47. The parties and witnesses disagree about what the wind speed was at the time of the accident. Grotlisch claimed that the winds were below 15–16 mph when the crane went down.[66] Several witnesses testified that the wind speed far exceeded the 11.5 mph that Shapiro determined was the maximum safe wind speed.

¶ 48. A local meteorologist, John Malan of WTMJ-TV, testified that at the time of the accident, Mitchell International Airport, 9.6 miles from Miller

---

[63] R.726:237.

[64] "Q: And what did you determine, for the size of that crane and the size of the piece being lifted, what, if any, [was the] safe wind speed not to exceed with 4R3? A: Eleven-and-a-half miles an hour." R.731:140.

[65] R.731:139–140; 743:187–88; 749:112.

[66] R.727:88–92.

Park, was reporting winds at 21 mph steady, gusting to 26 mph.[67] Further, ironworkers and operating engineers testified they observed winds between 20 to 32 mph throughout the afternoon, with gusts up to 35 mph.[68] According to video exhibits of the construction site, winds were high, with flags, light poles, bushes, and treetops blowing in the wind.[69] Shapiro estimated winds around 27 to 29 mph at the time of the accident.[70]

¶ 49. The evidence showed that MHIA was aware of the high winds. An Occupational Safety and Health Administration (OSHA) official on site that day told Wayne Noel, the MHIA safety superintendent, that a worker was blown off a scaffold by the wind.[71] The OSHA official also testified that about two hours before the lift, he heard Wayne Noel (on internal radio communications) state that he had reports of wind speeds of 32 mph.[72]

¶ 50. In his deposition, which was read to the jury, Dennis Frazer, the MHIA field supervisor who reported directly to Grotlisch, stated that about 45 minutes before the lift, it appeared to be "too windy to do the

---

[67] R.728:169–70.

[68] R.725:146–47, 214–215, 225, 228; R.727:217; *see also* Appendix to Plaintiff's Brief v.1, 110–111 (available at Wisconsin State Law Library).

[69] R.728:170, 172; 728:128–31, 161–74; 733:158–59.

[70] R.731:165. Shapiro based this calculation on the force required to cause the washer at the base of the boom to fail. The range of 27 to 29 mph took into account any extra force that might have been exerted on the crane by virtue of changes in the concrete runway as the crane started to tip over.

[71] R.728:33–34.

[72] R.728:72, 81, 94.

lift."[73] Wayne Noel testified he spoke with Grotlisch twice in the afternoon to express concern about the high speed of the winds.[74]

¶ 51. Communications between employees of MHIA and Lampson International stated that wind speeds were above 20 mph with gusts of 29 to 32 mph in the hour before the tragic lift.[75] An employee of Danny's Construction Co. testified that Wayne Noel was taking a wind reading with a hand-held anometer, although Noel denied using an anometer.[76]

¶ 52. On all the nine previous lifts by Big Blue, neither Grotlisch nor anyone else acting for MHIA did the necessary calculations for the purposes of determining the maximum safe wind speed in which Big Blue could operate.[77] Grotlisch admitted not considering the wind speed, asserting that he assumed Lampson International was taking the wind speed into account. Nevertheless, according to the plaintiffs' evidence, Grotlisch never asked anyone from Lampson International about or for wind-speed calculations at the time of the lift.[78] Grotlisch explained that had he known that Lampson International had neglected the calculations, he would not have proceeded with the lift.[79] He explained the failure to assure that the proper calculations were done by agreeing that he "dropped the ball."[80]

---

[73] R.728:284, 285.
[74] R.726:74–75.
[75] R.728:33–34.
[76] R.728:210.
[77] R.727:43–44, 171, 202.
[78] R.727:43–44.
[79] R.727:117–18.
[80] R.727:49.

¶ 53. Grotlisch testified that it would be a conscious disregard of the safety of workers if he proceeded with the lift had he observed wind speeds in excess of 20 mph with gusts of 26 mph.[81]

¶ 54. MHIA challenged the plaintiffs' evidence of wind speed and offered alternative interpretations of the estimates of wind speed at the time of the incident. For example, MHIA relies on Wayne Noel's testimony that the workers who were involved in the lift that day were told that "anyone in the room can stop this [lift] for any reason at any time if it is unsafe to continue,"[82] yet no one stopped the lift. MHIA also relies on the testimony of a Lampson International employee in charge of the mechanical operation of the crane, Alan Watts, that he assured Grotlisch that "there were not any problems with the lift."[83]

¶ 55. MHIA also presented evidence of other possible causes of the incident (not attributable to the conduct of its employees) such as Lampson International's alterations to the crane (including creating a gap in the king pin unit),[84] Lampson International's failure to equip the crane with a tiltmeter (or slope indicator) to alert the operator to unsafe

---

[81] R.727:94–95.

[82] R.726:130–31.

[83] R.739:11. Watts also testified that he was worried all day that the wind could have a bad effect and cause the crane to collapse and that he was hoping that Grotlisch would call off the lift. Watts also testified that he did not tell Grotlisch to stop the lift because of Grotlisch's intimidation and because he received orders from his bosses to obey Grotlisch. R.744:135, 171.

[84] Specifically, Neil F. Lampson, Inc. made some last-minute design changes to the crane, including the insertion of a copper washer at the point where the boom is secured to the base. The circuit court granted a directed verdict in favor of Neil F.

operating conditions, Danny's Construction Company's decision to place the three deceased ironworkers in the basket, thereby placing them in harm's way contrary to OSHA's regulations, and potential problems with either construction of the concrete runway upon which Big Blue moved or the ground underneath the runway.

¶ 56. Although the parties presented countervailing evidence about the cause of Big Blue's collapse, the jury could have believed—and apparently did believe—the plaintiffs' explanation of the incident.

¶ 57. Accordingly, the jury could have concluded that MHIA was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded. The jury could have reached this conclusion by believing that MHIA's course of conduct was deliberate in failing to follow the load chart, in failing to adhere to common practices used with other lifts at other sites, and in failing to calculate the maximum safe wind speed for a crane 45 stories high that was lifting, on a windy afternoon, a mass with a large surface area that weighed almost a million pounds.

¶ 58. To sum up, we are satisfied that the evidence about MHIA's failure to determine and factor in the wind speed, if believed, was, under the circumstances of the present case, in and of itself sufficient evidence, that MHIA was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded. The circuit court therefore properly submitted the question of a punitive damages award to the jury.

---

Lampson, Inc. This dismissal in favor of Neil F. Lampson, Inc. is an issue that was appealed to the court of appeals and still remains undecided.

¶ 59. As we previously stated, we decline to address the issue of the constitutionality of the amount of the punitive damages award because numerous issues remain unresolved and are not before us. Some of those issues may affect a constitutional analysis under *Trinity Evangelical Lutheran Church v. Tower Insurance Co.*,[85] *State Farm Mutual Automobile Insurance Co. v. Campbell*,[86] and *BMW of North America, Inc. v. Gore*.[87]

¶ 60. In summary, we respond to the three questions of law presented as follows:

¶ 61. (1) The court of appeals erroneously interpreted Wis. Stat. § 895.85(3). In *Strenke v. Hogner*, mandated on the same date as this opinion, this court has overruled the court of appeals' interpretation of Wis. Stat. § 895.85(3) set forth in its decision in the instant case.[88] We concluded in *Strenke v. Hogner* that the requirement in Wis. Stat. § 895.85(3) that the defendant act " 'in an intentional disregard of the rights of the plaintiff' necessitates that the defendant act with a purpose to disregard the plaintiff's rights or be aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded."[89] Accordingly, we conclude that Wis. Stat. § 895.85(3) requires a plaintiff to show that a defendant acted maliciously toward the plaintiff or intentionally disregarded the

---

[85] 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789.

[86] 538 U.S. 408 (2003).

[87] 517 U.S. 559 (1996).

[88] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 34.

[89] *Strenke v. Hogner*, 279 Wis. 2d 52, ¶ 36.

rights of the plaintiff, not that a defendant intended to cause harm or injury to the plaintiff.

¶ 62. (2) We further conclude that the evidence was sufficient to submit a punitive damages award question to the jury. The jury could have believed that the employees of MHIA did not compute or get the needed calculations of maximum safe wind speed for operating a crane 45 stories high while lifting a billboard-size load of nearly one million pounds in a windy afternoon.

¶ 63. (3) We decline to address the issue of the constitutionality of the amount of the punitive damages award because numerous issues remain unresolved and are not before us.

¶ 64. Accordingly, the decision of the court of appeals is reversed and the cause is remanded to the court of appeals for resolution of the remaining and as yet unresolved issues.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the court of appeals.

Justice DAVID T. PROSSER did not participate.

¶ 65. N. PATRICK CROOKS, J. (*concurring*). I join the majority opinion, except for paragraphs 9 and 59. In the present case, the majority correctly interprets Wis. Stat. § 895.85(3) and correctly concludes that there was sufficient evidence to present the punitive damages issue to the jury. However, the majority then declines to address the constitutionality of the $94 million punitive damages award. Majority op., ¶¶ 9, 57. I would review the punitive damages award, using the factors articulated by this court in *Trinity Evangelical Lutheran Church v. Tower Insurance Co.*, 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789, and by the United

States Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408 (2003) and *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996).

¶ 66. For the above stated reason, I respectfully concur.

¶ 67. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). The majority opinion concludes that the plaintiffs (collectively "Wischer") submitted sufficient evidence for a question on punitive damages to go to the jury, majority op., ¶ 8, a conclusion with which I agree. I write separately in concurrence because I disagree with the majority's rationale. I also agree with the majority's decision declining to address the issue of the constitutionality of the amount of the punitive damages award because of numerous unresolved issues that are not before us.

## I. SUFFICIENCY OF EVIDENCE

¶ 68. A question regarding punitive damages may be submitted to the jury if a reasonable jury could find from the evidence that entitlement to punitive damages has been proven by clear and convincing evidence. *See Strenke v. Hogner,* 2005 WI 25, ¶ 41, 279 Wis. 2d 52, 694 N.W.2d 296. This is a question of law that we review de novo. *See Walter v. Cessna Aircraft Co.,* 121 Wis. 2d 221, 231, 358 N.W.2d 816 (Ct. App. 1984). The evidence must be such that it is sufficient to satisfy Wis. Stat. § 895.85(3) (1999–2000)[1] as proving an intentional disregard of the rights of the plaintiff. *Apex Elecs. Corp. v. Gee,* 217 Wis. 2d 378, 389 n.14, 577 N.W.2d 23 (1998). Section 895.85(3) states:

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.

¶ 69. Pursuant to Wis. Stat. § 895.85(3), only an intentional disregard of rights, as compared with a reckless disregard of rights, will support an award of punitive damages. Therefore, when we are faced with a challenge to whether the evidence was sufficient to submit a question on punitive damages to the jury, we are required to examine evidence relevant to the defendant's state of mind. *See Allied Processors, Inc. v. Western Nat'l Mut. Ins. Co.*, 2001 WI App 129, ¶ 38, 246 Wis. 2d 579, 629 N.W.2d 329. Here, we do so through the actions of agents of Mitsubishi Heavy Industries America, Inc. (MHIA) who were then in charge of the lift. *Walter*, 121 Wis. 2d at 227.

¶ 70. We have concluded that an intentional disregard may be shown by proof that the person "is *aware* that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded." *Strenke*, 279 Wis. 2d 52, ¶ 36 (emphasis added). In order to satisfy this awareness requirement and establish the requisite intentional state of mind, a plaintiff must show both: (1) that the defendant was aware of what facts were substantially certain to cause a disregard of plaintiff's rights and (2) that the defendant was aware at the time of the conduct under examination that those facts existed. Therefore, in the case before us, Wischer must have submitted evidence to the jury to show that: (1) MHIA was aware of what level of wind speed would make the lift too dangerous to undertake and (2) MHIA was aware at the time of the lift that wind speeds were then in excess of permissible limits. Stated otherwise, it is the *awareness* of wind speeds that were too

38

dangerous at the time of the lift, which MHIA is deemed to have through the facts known to its supervisory employees, that determines the nature of MHIA's conduct at the time of the accident, i.e., whether the conduct was reckless or intentional.

¶ 71. In the case before us, Wischer argues that MHIA was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded. The right that is at issue here is the right of the ironworkers not to be subjected to conditions at the time of the lift that were substantially certain to result in injury to them. In order to establish that MHIA had the requisite state of mind, Wischer had to provide credible testimony that a supervisory employee of MHIA, who had the authority to stop the lift, was aware of what wind speeds could not safely be exceeded and that at the time of the lift, the supervisory employee knew the wind speeds exceeded those limits. Awareness of the wind speeds at the time of the lift is necessary to establish that conducting the lift under wind conditions then in existence was an intentional disregard of Wischer's rights, rather than a reckless disregard of those rights.

¶ 72. Victor Grotlisch, MHIA site superintendent, testified that if either he or Wayne Noel, MHIA safety superintendent, had observed wind speeds in excess of 20 miles per hour, with gusts to 26 miles per hour, and yet proceeded with the lift, that would have been a conscious disregard of the safety of the ironworkers.[2] Therefore, MHIA, itself, provided testimony that sus-

---

[2] Grotlisch testified that he believed the wind speeds were 15 to 17 miles per hour at the time of the lift. Noel also denied awareness of wind speeds in excess of 20 miles per hour, which he said was the wind limit for man-baskets that were used during the lift.

39

tained winds in excess of 20 miles per hour created conditions too dangerous to proceed with the lift.

¶ 73. The majority opinion focuses largely on the conduct of Grotlisch and on expert testimony showing that wind-load calculations should have been done, but were not. In so doing, it fails to show that MHIA had the requisite awareness of the wind speed at the time of the lift, which fact is necessary in order to prove the intentional state of mind required by Wis. Stat. § 895.85(3).

¶ 74. However, there is testimony in the record that Noel had the authority to stop the lift and also had the requisite awareness of wind speeds at the time of the lift. He explained this at trial, in part through the following adverse examination:

Q: Did Mr. Grotlisch have authority to shut down the lift if he felt it was unsafe to go?

A: Yes, he was one of the ones that could have, yes, sir.

Q: And were you also one of them?

A: Yes, sir.

Q: Could you do that without consulting with Victor Grotlisch?

A: I would try to include all the team players, sir.

Q: But my question is, could you, if you felt—

A: Yes, anybody could, sir.

Noel said that he did not know that the wind speed at the time of the lift was at a level that would be too dangerous to proceed with the lift. However, Michael

40

Ellison, an ironworker who was familiar with Noel's radio instructions and was present when the accident occurred, stated that approximately 90 minutes before the accident he heard Noel report wind speeds that were clearly over the permissible limits set by Grotlisch and Noel. Ellison testified as follows:

> Q: Mr. Ellison, at approximately 3:30 p.m., did you also hear Wayne Noel make a statement on the radios?
>
> A: Yes, sir, I did.
>
> Q: And would you please tell the jury what you heard from Wayne Noel over the radio at that time?
>
> A: He said, gentlemen, I would like for you to know that I have reports of wind speeds of 32 miles per hour.

While cross-examination tried to show that Ellison mistook the voice of another for Noel, and that the time at which he said he heard Noel may not have been precise, the jury was entitled to accept Ellison's statement as Noel's awareness that at the time the lift was ongoing there were wind gusts of 32 miles per hour.

¶ 75. The jury was also entitled to believe Robert Becker, an ironworker who testified to hearing Noel on the radio only one hour before the crane failed, causing the three men in the man-basket to fall. He testified:

> Q: . . . [D]id you hear a communication made by Wayne Noel over the radio?
>
> A: Yes, I did.

41

Q: And when was that?

A: Approximately an hour before the collapse.

Q: Okay. And at that time where was the crane and the roof piece?

A: It was approximately 20 feet from the target area.

Q: And had you, on prior occasions and on that day, heard Wayne Noel's voice over the radio?

A: Yes, I had.

Q: And were you able to recognize his voice?

A: Yes, I had.

Q: What did you hear from Mr. Noel over the radio at that time?

. . .

[A] He stated that we had sustained winds at 26 to 28 miles an hour.

¶ 76. Therefore, the jury had before it testimony that Noel, who could have called off the lift, was aware that doing a lift in winds in excess of 20 miles per hour was unreasonably dangerous, even without doing any wind-load calculations. Additionally, the jury heard testimony that Noel was aware that *at the time of the accident,* wind speeds exceeded 20 miles per hour. This is sufficient evidence from which a reasonable jury could find, by the clear and convincing standard of proof, that MHIA was aware that its conduct was substantially certain to result in Wischer's rights being

42

disregarded. Accordingly, I conclude that the question on punitive damages was properly submitted for jury consideration.

## II. UNRESOLVED ISSUES

¶ 77. The majority declined to address the issue of the constitutionality of the amount of the punitive damages award because of numerous unresolved issues that are not before us, giving two examples of issues that could impact a constitutional analysis of the award. I also note that whether the decedents were loaned employees of MHIA and therefore barred from bringing claims against MHIA by the exclusive remedy rule of the Worker's Compensation Act, Wis. Stat. § 102.03(2), is an unresolved issue that could impact the punitive damages award.

¶ 78. Upon the foregoing reasons, I respectfully concur.

¶ 79. JON P. WILCOX, J. (*dissenting*). The majority in this case and in *Strenke v. Hogner,* 2005 WI 25, 279 Wis. 2d 52, 694 N.W.2d 296, has written a duly enacted law of this state out of existence. It is undisputed that the clear intent of the legislature in enacting Wis. Stat. § 895.85(3) (1999–2000)[1] was to restrict the number of cases in which punitive damages could be awarded by imposing a threshold for the recovery of such damages higher than that which was set under our common law. However, as this case illustrates, the majority has interpreted and applied § 895.85(3) in a manner that is indistinguishable from our common-law standard. In doing so, the majority has thwarted the

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

will of the people of this state (as represented by the legislature) to make recovery of punitive damages more difficult.

¶ 80. Although this case presents tragic facts, the actions of the defendant, at most, constitute reckless behavior. The plaintiffs are certainly entitled to be compensated for their losses occasioned by the defendant's actions. However, the defendant's conduct in this case, while sufficient to support an award of punitive damages under our common law, is simply no longer adequate to support an award of punitive damages following the legislature's enactment of § 895.85(3).

¶ 81. Because the defendant's conduct clearly falls within the lower, common-law standard for awarding punitive damages, the majority's allowance of punitive damages in this case under § 895.85(3) highlights its erroneous interpretation of the statute and the fact that it has rendered the supposedly stricter statutory standard for punitive damages indistinguishable from the common-law standard. The majority's interpretation and application of § 895.85(3), so as to allow for punitive damages based on conduct that, at most, constitutes a reckless disregard of the plaintiffs' rights, is clear evidence that the court has rendered § 895.85(3) a nullity.

I

¶ 82. Section 895.85(3) provides: "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." In contrast, our common law allowed for punitive damages upon "a showing of wanton, wilful,

or reckless disregard of the plaintiff's rights." *Kink v. Combs,* 28 Wis. 2d 65, 79, 135 N.W.2d 789 (1965).

¶ 83. As discussed in depth in my concurrence in today's companion case, *Strenke,* 279 Wis. 2d 52, ¶ 68 (Wilcox, J., concurring), the phrase "disregard of the plaintiff's rights" under the common law was utilized as "a shorthand for describing all of the various types of harm giving rise to punitive damages when coupled with the appropriate mental state of the defendant." The majority's interpretation of § 895.85(3) is premised on the faulty notion that our common law allowed for recovery of punitive damages if an individual recklessly disregarded a plaintiff's abstract rights. Contrary to the majority's position, our "common law required more than a showing that the defendant recklessly disregarded the plaintiff's 'rights' in the abstract in each particular case." *Id.,* ¶ 68. Under the common law, "we focus[ed] on the defendant's knowledge and state of mind at the time of the [injury]" when evaluating whether his "conduct evidence[d] a reckless indifference to or disregard of the plaintiff's rights." *Brown v. Maxey,* 124 Wis. 2d 426, 434, 369 N.W.2d 677 (1985). "[I]n each case, our analysis focused on the defendant's awareness of the likelihood of some type of harm, rather than the likelihood of a violation of the plaintiff's rights in the abstract." *Strenke,* 279 Wis. 2d 52, ¶ 73 (Wilcox, J., concurring).

> [P]unitive damages were allowed under the common law if the defendant acted with knowledge or apprecia-tion that his conduct created an unreasonable risk of harm and that there was a strong probability that harm would result. While the phrase "rights of others" was used in a general sense to include the various types of injuries that could give rise to punitive damages, in each case, we focused on the particular harm caused by

45

the defendant's conduct. The phrase "willful, wanton, or reckless" referred to the defendant's knowledge of the likelihood of harm—his knowledge that his conduct created at least a "strong probability" that harm would result.

*Id.,* ¶ 85 (Wilcox, J., concurring) (footnote omitted).

¶ 84. The circumstances under which punitive damages could be awarded under our common law were aptly summarized in a punitive damages treatise written by two Marquette University Law School professors that was repeatedly discussed, cited, and relied upon by both our case law and jury instructions relating to punitive damages:

> The conduct which the varying terms describes is generally of two distinct types. With the first the defendant desires to cause the harm sustained by the plaintiff, or believes that the harm is substantially certain to follow the conduct. *With the second the defendant knows, or should have reason to know, not only that the conduct creates an unreasonable risk of harm, but also that there is a strong probability, although not a substantial certainty, that the harm will result* and, nevertheless, proceeds with the conduct in reckless or conscious disregard of the consequences.

James D. Ghiardi & John J. Kircher, 1 *Punitive Damages L. & Prac.* § 5.01, at 8 (1996) (emphasis added).

¶ 85. Thus, "the phrase 'willful, wanton, or reckless disregard of rights' meant that the defendant engaged in a volitional act with knowledge or appreciation that his conduct created an unreasonable risk of harm and that there was a strong probability that harm would result." *Strenke,* 279 Wis. 2d 52, ¶ 68 (Wilcox, J., concurring). *See, e.g., Loveridge v. Chartier,* 161 Wis. 2d 150, 188, 468 N.W.2d 146 (1991); *Maxey,* 124 Wis. 2d at 433–34; *Lundin v. Shimanski,* 124 Wis. 2d 175, 197

46

n.14, 368 N.W.2d 676 (1985). Indeed, this court specifically held that punitive damages were not appropriate if the defendant did not know that his conduct created a strong probability of harm to the plaintiff. *Loveridge,* 161 Wis. 2d at 190–91.

¶ 86. Once one correctly understands the meaning and application of the phrase "disregard of the plaintiff's rights" under the common law, the result of the legislature's decision to remove the availability of punitive damages where the defendant acted in a "wanton, willful, or reckless" disregard of the plaintiff's rights becomes clear. In enacting § 895.85(3) and requiring that the defendant "intentionally" disregard the plaintiff's rights, the legislature "heightened the state of mind required of the actor and left intact the link between the actor's state of mind and the likelihood of the harm." *Strenke,* 279 Wis. 2d 52, ¶ 86 (Wilcox, J., concurring). Thus, "[s]ection 895.85(3) requires that the defendant intend the consequences of his actions—that is, intend to harm the plaintiff—in order to be liable for punitive damages." *Id.,* ¶ 63 (Wilcox, J., concurring).

> [W]ith the enactment of § 895.85, it is no longer sufficient for the defendant to know or have reason to know "that the conduct creates an unreasonable risk of harm, [and] also that there is a strong probability, although not a substantial certainty, that the harm will result." James D. Ghiardi & John J. Kircher, 1 *Punitive Damages L. & Prac.* § 5.01, at 8 (1996). Rather, following the enactment of § 895.85, it *is* necessary that the defendant have knowledge that there is a "substantial certainty" that harm will result from his conduct.

*Id.,* ¶ 87 (Wilcox, J., concurring).

¶ 87. In other words, if the phrase "reckless disregard of the plaintiff's rights" under the common law

meant "the defendant knew or should have known that his or her conduct created an unreasonable and strong probability of harm[,]" *Loveridge,* 161 Wis. 2d at 191,[2] then the phrase "intentional disregard of the rights of the plaintiff" under § 895.85(3) must mean that the defendant, at the very least, knew his conduct was substantially certain to result in harm or injury to the plaintiff.

## II

¶ 88. If one parses the shroud of legal jargon, posturing, and rhetoric in this case and in *Strenke,* what a majority of this court really has done is to allow punitive damages under § 895.85(3) in the same circumstances in which they were allowed under our common law. This is evident because the plaintiffs' own characterization of the defendant's conduct in this case demonstrates that such conduct falls squarely within the lower common-law threshold for awarding punitive damages.

¶ 89. As counsel for the plaintiffs indicated at oral argument, the evidence in this case established that the defendant's employees proceeded with the lift in question "despite the potential for harm." They knew of the wind speed, were aware of "the danger that was obvious" that someone could be killed, and, in performing the lift, exhibited a "conscious disregard of workers' safety." Aware that proceeding with the lift in question would "probably cause a tragedy," they acted deliberately in nonetheless proceeding with the lift. In short, they were "aware of the risks and proceeded notwithstanding the risks."

---

[2] *See also Brown v. Maxey,* 124 Wis. 2d 426, 433–34, 369 N.W.2d 677 (1985).

¶ 90. This characterization of the defendant's conduct is a perfect description of the lower, common-law requirement for recovering punitive damages. Under the common law, " '[r]eckless indifference to the rights of others and conscious action in deliberate disregard of them . . . [could] provide the necessary state of mind to justify punitive damages.' " *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 267, 294 N.W.2d 437 (1980) (quoting Restatement (Second) of Torts, § 908, cmt. b. (1977)).

> The actor's conduct is in reckless disregard of the safety of another if he does an act . . . knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (1965).

¶ 91. In other words, here, the defendant, through its employees, acted with " 'a *purpose to take known chances of perpetrating an injury.*' " *Wangen,* 97 Wis. 2d at 274 (quoting *Bielski v. Schulze,* 16 Wis. 2d 1, 14–15, 114 N.W.2d 105 (1962)) (emphasis added). That is, the evidence in this case establishes that the defendant "realize[d] or, from facts which [it] kn[ew], should [have] realize[d] that there [was] a strong probability that harm [could] result." Restatement (Second) of Torts § 500, cmt. f (1965) (contrasting reckless disregard of safety with intentional misconduct).

¶ 92. While this type of conduct clearly would have met the common-law standard for awarding punitive damages, and may, in the view of some in the legal community, be deserving of punishment, we must apply the statute the legislature has written. As § 895.85(3) unquestionably heightened the standard for recovering

punitive damages, conduct that would have fallen within the lowest common-law category for awarding punitive damages—a reckless disregard of the plaintiff's rights—simply cannot be sufficient for an award of punitive damages under the standard provided by the statute. In allowing punitive damages to be awarded in this case, the majority has lowered the bar the legislature raised when enacting § 895.85(3) and has thus rendered the statute a virtual nullity.

## III

¶ 93. As explained above, the court of appeals in the instant case correctly concluded that § 895.85(3), properly interpreted, "require[s] either an intent by a defendant to cause injury to the plaintiffs or knowledge that the defendant's conduct was practically certain to cause the accident or injury to the plaintiffs." *Wischer v. Mitsubishi Heavy Indus. Am., Inc.,* 2003 WI App 202, ¶ 5, 267 Wis. 2d 638, 673 N.W.2d 303. Applying this standard to the facts of this case, it is clear that the defendant's conduct does not rise to the level necessary to award punitive damages.

¶ 94. In order to obtain insurance coverage and avoid the intentional acts exclusion of one of the defendant's insurance policies, the plaintiffs strenuously argued in the circuit court that the defendant's conduct did not rise to the level of an intent to cause harm: "Nowhere in the record is there any evidence that the MHIA employees subjectively intended to cause bodily injury to the decedents. . . . Federal cannot show that any injury to the decedents was substantially certain to occur from the MHIA employees' acts." In addition, they stated:

> There is no evidence to permit a reasonable jury to conclude that the MHIA employees intended to cause

bodily injury to the decedents or that they knew or should have known that bodily injury to the decedents was substantially certain to follow from their acts.

. . . .

None of this testimony [that of Victor Grotlisch, Howard Shapiro, and William Keefe], however, is sufficient, by itself or in combination, to establish that the MHIA's employees [sic] acts on July 14, 1999 were substantially certain to result in bodily injury. The testimony is not even sufficient to create an issue of fact on the matter.

¶ 95. Furthermore, they contended that "[n]one of Grotlish's [sic] testimony . . . establishes that there was a substantial certainty that bodily injury would occur. . . . The fact that Grotlisch was in the zone of danger indicates that he could not have believed that there was a substantial certainty that injury would occur."

¶ 96. As such, plaintiffs' own arguments foreclose any possibility that the defendant's conduct qualifies for punitive damages under a correct reading of § 895.85(3). Therefore, because the majority has erroneously interpreted § 895.85(3) and applied it in a manner that is no different from the common-law standard for awarding punitive damages, I respectfully dissent.