COURT OF APPEALS
DECISION
DATED AND FILED

September 24, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP1774**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CV43

**IN COURT OF APPEALS
DISTRICT IV**

JASEN DANE RANCH, LLC,

    PLAINTIFF-APPELLANT,

  V.

NELSON HARDWOOD LUMBER COMPANY, INC. AND
WEST BEND MUTUAL INSURANCE COMPANY,

    DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Iowa County: MARGARET MARY KOEHLER, Judge. *Affirmed*.

Before Fitzpatrick, P.J., Graham, and Nashold, JJ.

¶1 GRAHAM, J. Nelson Hardwood Lumber Company, Inc.,[1] mismarked a property boundary line and, as a result, erroneously harvested trees from a parcel that belongs to Jasen Dane Ranch, Inc. (JDR). The sole question for trial was whether JDR is entitled to punitive damages as a result of Nelson Hardwood's conduct. The circuit court determined that JDR had not established a prima facie case for punitive damages and, pursuant to WIS. STAT. § 895.043(4) (2017-18),[2] the court declined to submit a punitive damages question to the jury. We affirm.

## BACKGROUND

¶2 JDR owns a large wooded property located in Iowa County. Vivid Inc., which is not a party to this lawsuit, is JDR's neighbor to the west. The boundary that JDR shares with Vivid is a jagged line, with the two parcels fitting together like jigsaw pieces.

¶3 Vivid and Nelson Hardwood entered into a logging contract under which Nelson Hardwood was to harvest trees from Vivid's property. When Nelson Hardwood attempted to mark Vivid's shared boundary with JDR, it inaccurately marked a strip of JDR's parcel as belonging to Vivid. As a result, Nelson Hardwood harvested approximately 70 trees from JDR's parcel before the error was discovered.

---

[1] Nelson Hardwood's insurer, West Bend Mutual Insurance Company, is also a party to this appeal. For the sake of simplicity, we refer to both collectively as "Nelson Hardwood" when addressing arguments that are advanced in their respondents' brief.

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶4   JDR brought claims against Nelson Hardwood for unauthorized cutting, conversion, and trespass.  It demanded statutory damages under Wisconsin's timber trespass statute, WIS. STAT. § 26.09, and punitive damages under Wisconsin's punitive damages statute, WIS. STAT. § 895.043.  On summary judgment, the circuit court determined that Nelson Hardwood failed to take reasonable precautions to locate the harvesting boundaries of Vivid's property, and that JDR was entitled to the greater of four times the stumpage value or two times the fair market value of the trees that were wrongfully harvested pursuant to § 26.09(3)(b)3.  The parties ultimately stipulated to an amount of statutory damages, but they were unable to agree about JDR's entitlement to punitive damages.  That question proceeded to a jury trial.

¶5   At the close of JDR's case, the circuit court determined that the evidence was insufficient to support a punitive damages award, and that it would not submit a punitive damages question to the jury.  Because JDR's entitlement to punitive damages was the sole issue for trial, the court excused the jury and entered a judgment in Nelson Hardwood's favor.

¶6   We present additional facts about the evidence at trial as needed in the discussion section below.

## DISCUSSION

¶7   Punitive damages are a legal remedy[3] that may be available if the plaintiff proves that "the defendant acted maliciously toward the plaintiff or in an

---

[3] The parties sometimes refer to JDR's demand for punitive damages as its "punitive damages claim," but we refrain from using this phrase because it can be misleading.  To be sure, Wisconsin courts often use the word "claim" as shorthand when referring to a demand for punitive damages.  *See, e.g.*, ***Strenke v. Hogner***, 2005 WI 25, ¶¶7, 74, 279 Wis. 2d 52, 694

(continued)

intentional disregard of the rights of the plaintiff." WIS. STAT. § 895.043(3). Before a circuit court submits punitive damages questions to the jury, the court must first determine whether the plaintiff made a "prima facie case for the allowance of punitive damages." *See* § 895.043(4). This requires the court to determine whether "a reasonable jury could find" that the plaintiff has proved its entitlement to punitive damages by "clear and convincing evidence." *Strenke v. Hogner*, 2005 WI 25, ¶41, 279 Wis. 2d 52, 694 N.W.2d 296. The circuit court's obligation to assess the sufficiency of evidence to support a punitive damages award has been referred to as its "gatekeeper function," *see, e.g.*, *id.*, ¶40, and, for ease of reference, we sometimes refer to a court's determination about whether to submit a punitive damages question to the jury as its "gatekeeper decision."

¶8 JDR advances two related arguments in this appeal. First, JDR argues that the circuit court applied the wrong standard of proof when it made its gatekeeper decision; second, JDR contends that it made a prima facie case that Nelson Hardwood's conduct satisfied the standard of conduct set forth in WIS. STAT. § 895.043(3). Before turning to these arguments, we first resolve the parties' dispute about the proper standard of appellate review.

---

N.W.2d 296; *Henrikson v. Strapon*, 2008 WI App 145, ¶¶1, 9, 314 Wis. 2d 225, 758 N.W.2d 205. However, the word "claim" is a legal term of art which is "generally used to denote a judicially cognizable cause of action." *City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 157 (1997). A demand for punitive damages, by contrast, is "in the nature of a remedy" that may be available if a plaintiff prevails in an underlying cause of action, and "should not be confused with the concept of a cause of action." *Becker v. Automatic Garage Door Co.*, 156 Wis. 2d 409, 415, 456 N.W.2d 888 (Ct. App. 1990).

Here, JDR brought claims—that is, causes of action—for unauthorized cutting, conversion, and trespass. Use of the phrase "punitive damages claim" may incorrectly suggest that JDR's demand for punitive damages is a freestanding or independent cause of action, when it is instead a demand for a specific remedy.

## I. The Standard of Appellate Review

¶9 Wisconsin's punitive damages statute, WIS. STAT. § 895.043, was originally enacted in 1995. *Strenke*, 279 Wis. 2d 52, ¶14 (citing 1995 Wis. Act 17).[4] Prior to its enactment, punitive damages were governed by the common law. *Id.*, ¶15. Under both the statute and common law, circuit courts have been required to serve as gatekeepers and determine whether the evidence is sufficient to submit a punitive damages question to the jury. *See* § 895.043(3); *see also Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 735, 456 N.W.2d 585 (1990). And under both the statute and the common law, Wisconsin courts have consistently held that the circuit court's gatekeeper decision presents a question of law, which is reviewed independently by appellate courts. *Strenke*, 279 Wis. 2d 52, ¶13 (providing for a de novo standard of review under the statute); *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶32, 279 Wis. 2d 4, 694 N.W.2d 320 (same); *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶37, 312 Wis. 2d 251, 752 N.W.2d 800 (same); *Bank of Sun Prairie*, 155 Wis. 2d at 736 (providing for a de novo standard of review under the common law); *Lievrouw v. Roth*, 157 Wis. 2d 332, 344, 459 N.W.2d 850 (Ct. App. 1990) (same).

¶10 Nelson Hardwood acknowledges that the standard of review is de novo, but it also argues that on review, we should affirm the circuit court's gatekeeper decision unless it is "clearly wrong." That is, Nelson Hardwood seems to suggest that we should review the court's decision independently, while at the

---

[4] WISCONSIN STAT. § 895.043 (2017-18) was originally numbered WIS. STAT. § 895.85. *See* 1995 Wis. Act 17, § 3. Although the legislature renumbered that statute in 2005, *see* 2005 Wis. Act 155, § 71, the pertinent language is unchanged.

same time giving some level of deference to the decision. Nelson Hardwood does not attempt to explain how these two standards of review could be compatible.

¶11 Nelson Hardwood relies on *Berner Cheese*, 312 Wis. 2d 251, ¶36, for the proposition that the "clearly wrong" standard of review applies to a circuit court's gatekeeper decision, but it has misinterpreted the pertinent holdings of that case. In *Berner Cheese*, a cheese manufacturer sued its former attorney for malpractice and breach of fiduciary duty, *id.*, ¶29, and it sought both compensatory and punitive damages, *id.*, ¶33. At the close of the evidence, the circuit dismissed the breach of fiduciary duty claim for insufficient evidence, and it also declined to submit a punitive damages question to the jury. *Id.*, ¶33. On review, our supreme court addressed two separate questions: whether there was sufficient evidence to support the claim for breach of fiduciary duty, and whether there was sufficient evidence to send the punitive damages question to the jury. *Id.*, ¶1. Although both issues turn on whether the evidence is "sufficient" for a specified purpose, they are governed by different statutes and different standards of review. *See id.*, ¶¶36-37. Untangling these separate issues is the key to resolving the dispute between Nelson Hardwood and JDR about the standard of review in this case.

¶12 Nelson Hardwood cites paragraph 36 of *Berner Cheese* in support of the "clearly wrong" standard. Yet, paragraph 36 addresses the standard of review of the sufficiency of the evidence to support the claim for breach of fiduciary duty, not the circuit court's gatekeeper decision on punitive damages. It is the very next paragraph in *Berner Cheese* that correctly sets forth the standard of review for a court's gatekeeper decision: "We independently review whether there is sufficient evidence to submit a question on punitive damages to the jury." 312 Wis. 2d 251, ¶37 (citing *Strenke*, 279 Wis. 2d 52, ¶13). Because the sole issue in this case is

whether the circuit court properly determined that the evidence was insufficient to submit a punitive damages question to the jury, we apply a de novo standard of review.

## II.  The Standard of Proof[5]

¶13     Both parties cite **Berner Cheese** for the proposition that the circuit court was required to view the evidence in the "light most favorable" to JDR and to search for "any credible evidence by which the jury could have reasonably concluded" that JDR was entitled to punitive damages.  JDR argues that the circuit court applied the wrong standard of proof and that, if it had applied the correct standard, it would have determined that the evidence was sufficient.  For its part, Nelson Hardwood appears to agree that JDR has correctly stated the applicable standard of proof, even though it disagrees with Nelson Hardwood's application of that standard to the facts of this case.

¶14     Because our standard of review is de novo, our review is "unaffected by whether the circuit court had a mistaken view" about the proper standard of proof.  *See **Henrikson v. Strapon***, 2008 WI App 145, ¶18, 314 Wis. 2d 225, 758 N.W.2d 205.  We nevertheless address JDR's arguments about this standard because both parties have misstated it, and because we will have to apply the

---

[5] By "standard of proof," we mean the "the degree of certainty by which the factfinder must be persuaded of a factual conclusion to find in favor of the party bearing the burden of persuasion." ***Microsoft Corp. v. i4i Ltd. P'ship***, 564 U.S. 91, 100 n.4 (2011).

correct standard in our independent review of whether the evidence was sufficient to submit the punitive damages question to the jury.[6]

¶15    JDR cites WIS. STAT. § 805.14[7] for the proposition that, when a court makes its gatekeeper decision, it must view the evidence in the "light most favorable" to a punitive damages award and must send the question of punitive damages to the jury if there is "any credible evidence" to support a punitive damages award.   Yet, it is WIS. STAT. § 895.043 that specifically governs the sufficiency of evidence needed to submit a punitive damages question to the jury and, as discussed above, our cases have interpreted § 895.043 to require proof "by clear and convincing evidence." *Wischer*, 279 Wis. 2d 4, ¶34; *Strenke*, 279 Wis. 2d 52, ¶41.

¶16    JDR contends that WIS. STAT. § 805.14 and WIS. STAT. § 895.043 are compatible, and that both apply when a circuit court makes its gatekeeper decision.   But JDR fails to explain how a standard that looks to whether there is any "credible evidence" is compatible with a standard that looks to whether a jury could find that there is "clear and convincing evidence" to support a punitive damages award.   *Compare* § 805.14(1) *with Strenke*, 279 Wis. 2d 52, ¶41.   We

---

[6] "[W]e are not bound by the parties' interpretation of the law or obligated to accept a party's concession of law." *State v. Carter*, 2010 WI 77, ¶50, 327 Wis. 2d 1, 785 N.W.2d 516 (footnote omitted).

[7] Wisconsin Stat. § 805.14(1) provides:

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

conclude that the standards of proof associated with § 805.14 and § 895.043 are not compatible.

¶17    JDR also cites *Berner Cheese*, 312 Wis. 2d 251, *Henrikson*, 314 Wis. 2d 225, and *Weiss*, 197 Wis. 2d 365, to support its assertion that WIS. STAT. § 805.14 applies to the court's gatekeeper decision.  As explained below, none of these cases support this conclusion.

¶18    JDR's reliance on *Berner Cheese* misses the mark for substantially the same reasons we discussed above in ¶¶11-12.  *Berner Cheese*'s discussion of "the light most favorable" was limited to its discussion of the sufficiency of the evidence to support the claim for breach of fiduciary duty under WIS. STAT. § 805.14.  *See Berner Cheese*, 312 Wis. 2d 251, ¶36.  When it discussed the circuit court's gatekeeper decision on punitive damages, the *Berner Cheese* court did not cite § 805.14, nor did it suggest that the circuit court was required to view the evidence supporting an award of punitive damages in the "light most favorable" to the plaintiff.  *See id.*, ¶¶37, 61-72.

¶19    Based on its interpretation of *Henrikson*, JDR states that "the court's gatekeeping role involves 'draw[ing] all reasonable inferences from the evidence in the light most favorable to the non-moving party.'"  *See Henrikson*, 314 Wis. 2d 225, ¶13.  But JDR takes this language from *Henrikson* out of context. *Henrikson* involved an appeal from the circuit court's grant of summary judgment, *see id.*, ¶1, and the language JDR cites actually pertains to the well-

9

known summary judgment standard, not to the court's gatekeeper function under WIS. STAT. § 895.043(4).[8]

¶20     The final case that JDR relies on is *Weiss*, but that case does not discuss a circuit court's gatekeeper function at all.  In *Weiss*, the plaintiff sued his insurance company for bad faith, and he sought compensatory and punitive damages.  *Weiss*, 197 Wis. 2d at 376-77.  The jury returned a verdict in the plaintiff's favor, but the circuit court changed the verdict under WIS. STAT. § 805.14 because it concluded that the evidence was insufficient to support a claim of bad faith.  *Id.*  The circuit court also reversed the jury verdict on punitive damages—not because it was exercising its gatekeeper function, but rather as a consequence of its determination that the insurer was not liable at all on the underlying cause of action.  *Id.* at 373, 376-77.  The *Weiss* court did not mention the circuit court's role as a gatekeeper, and it did not address the standard of proof that applies to the court's gatekeeper decision.

¶21     JDR does not identify any case that applies WIS. STAT. § 805.14 to a circuit court's gatekeeper function, and we have found none.  We conclude that § 805.14 has no application to the circuit court's gatekeeper function under WIS. STAT. § 895.043.  The evidence required to submit a punitive damages question to the jury is governed by § 895.043, which requires the plaintiff to "establish[] a prima facie case."[9]  And, as stated above, a plaintiff has established a prima facie

---

[8] *See* **Henrikson**, 314 Wis. 2d 225, ¶13 (discussing the summary judgment standard and citing **Burbank Grease Servs., LLC v. Sokolowski**, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781, a case that did not involve punitive damages).

[9] JDR asserts in passing that "it was actually Nelson Hardwood's burden (on its motion) to prove that no reasonable jury" could award punitive damages.  JDR cites no authority for this assertion, and it is inaccurate.  The defendant does not bear any burden when the court makes its gatekeeper decision—instead, as we have explained, the court is to determine whether a

(continued)

case if a "reasonable jury" could find that the plaintiff proved that it is entitled to punitive damages "by clear and convincing evidence." *Wischer*, 279 Wis. 2d 4, ¶34; *Strenke*, 279 Wis. 2d 52, ¶41. This is the standard that the circuit court was required to apply when it made its gatekeeper decision,[10] and it is also the standard that we apply in our de novo review of the evidence on appeal.

### III. The Standard of Conduct

¶22   We now consider whether JDR established a prima facie case for punitive damages. We begin by explaining the standard of conduct that must be proven to warrant a punitive damages award, and we then apply that standard to the evidence of Nelson Hardwood's conduct that was introduced at trial. For the reasons that we explain below, we agree with the circuit court and conclude that a reasonable jury could not find by clear and convincing evidence that Nelson Hardwood was "aware" that its conduct was "substantially certain to result in the [JDR's] rights being disregarded." *See Strenke*, 279 Wis. 2d 52, ¶¶38, 41-42.

### A. Intentional Disregard

¶23   "[P]unitive damages are not recoverable if the wrongdoer's conduct is merely negligent," *Strenke*, 279 Wis. 2d 52, ¶42, and the "vast majority of

---

reasonable jury could find that the plaintiff has proved its entitlement to punitive damages by clear and convincing evidence.

[10] We acknowledge that some of the language the circuit court used to express its gatekeeper decision appeared to consider whether the court was itself satisfied that JDR was entitled to punitive damages—not whether a reasonable jury could reach this conclusion. The court explained that although it was a "close call, … the court did not find by clear and convincing evidence that [Nelsen Hardwood's employee] was malicious or showed an actual disregard for the rights of plaintiff. Rather, he was very negligent.…" But even if the circuit court misstated the standard, it is immaterial on appeal, since we review the evidence and apply the legal standard de novo. *See Henrikson*, 314 Wis. 2d 225, ¶18.

negligence cases" do not give rise to a punitive damages remedy, *id.*, ¶39 (quoting *Brown v. Maxey*, 124 Wis. 2d 426, 432, 369 N.W.2d 677 (1985)). Even under the common law standard that preceded Wisconsin's punitive damages statute, a defendant's conduct must have been "outrageous," and a plaintiff was not entitled to punitive damages unless the defendant acted with a "wanton, willful and reckless disregard" of another person's rights. *Id.*, ¶19.

¶24 When the legislature enacted Wisconsin's punitive damages statute, it replaced the common law standard as follows: "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."[11] *Id.*, ¶19; WIS. STAT. § 895.043(3). In so doing, the legislature meant to "heighten" the state of mind required for punitive damages, and to ensure that, going forward, "there would be even fewer negligence cases giving rise to punitive damages." *Strenke*, 279 Wis. 2d 52, ¶¶19, 39.

¶25 JDR argues that Nelson Hardwood acted in "intentional disregard" of its property rights when it mismarked JDR's common boundary with Vivid. Accordingly, this appeal turns on the interpretation and application of the intentional disregard standard. As our supreme court has explained, this standard is somewhat difficult to parse because "the words 'intentional' and 'disregard' do not easily combine." *Strenke*, 279 Wis. 2d 52, ¶34. *Strenke* and *Henrikson* are two of the leading cases to discuss the meaning and application of this standard, and both shed light on its application here.

---

[11] As our supreme court has explained, conduct "need not be directed at the specific plaintiff seeking punitive damages in order [for the plaintiff] to recover under the statute." *Strenke*, 279 Wis. 2d 52, ¶51.

¶26     *Strenke* was the first case from our supreme court to address the punitive damages standard after the punitive damages statute was enacted. The *Strenke* court observed that the legislature retained the phrase "disregard of … rights" from the common law, and that under the common law, that phrase "described a type of conduct that involved an indifference on the defendant's part to the consequences of his or her actions" and which "resulted in the harm or injury suffered." *Id.*, ¶31. The *Strenke* court therefore interpreted the new statutory standard in this light. It concluded that to satisfy the intentional disregard standard, the defendant's conduct must have been "deliberate"—that is, the defendant must have acted "with a purpose to disregard the plaintiff's rights" or have been "aware" that their conduct was "substantially certain to result in the plaintiff's rights being disregarded." *Id.*, ¶38. The defendant's conduct must have "actually disregard[ed]" the plaintiff's rights.[12] *Id.* And the conduct must have been "sufficiently aggravated to warrant punishment by punitive damages." *Id.*

¶27     The conduct at issue in *Strenke* was drunk driving. In that case, the defendant had already been convicted of driving drunk on four prior occasions, and on the night in question, he consumed as many as eighteen cans of beer before getting behind the wheel and veering into the plaintiff's lane. *Id.*, ¶¶57, 55. Under these circumstances, our supreme court determined that the defendant's conduct was not merely negligent. This conduct satisfied the intentional disregard standard because "there was sufficient evidence that [the defendant] was aware that his conduct was substantially certain to cause a disregard of [the plaintiff's] rights." *Id.*, ¶54.

---

[12] That requirement is not at issue here because it is undisputed that Nelson Hardwood actually took JDR's property.

¶28    The ***Henrikson*** case provides a helpful contrast to ***Strenke***.    In ***Henrikson***, we also considered an injury caused by the defendant's drunk driving. We considered whether we could infer based on the evidence that the defendant "was aware that his conduct was substantially certain to result in the disregard" of the plaintiff's rights, and we ultimately concluded that the record did not support such an inference. ***Id.***, ¶¶29, 35.  We noted that the defendant had no prior OWI convictions and that his blood alcohol concentration was only "a relatively modest amount above the legal limit" when the accident occurred, and we concluded that there was not a reasonable basis in the record to infer that the defendant "knew he was impaired from alcohol to a degree that made his driving a threat to the safety of pedestrians."    ***Id.***, ¶30.    Put another way, we concluded that it was not reasonable to infer from the record that the defendant "was aware" his conduct was a "threat" to the rights of others.  ***Id.***

## B.  The Trial Evidence

¶29    With these cases in mind, we turn to JDR's arguments about the evidence that was introduced at trial.  In so doing, we note that JDR's arguments are built around its premise that it needed only to put forth "any credible evidence" to support a punitive damages award, and that the evidence should be viewed "in the light most favorable" to JDR.  But as we explained in Section II, that is not the appropriate standard of proof.  When we apply the correct standard, which looks to whether a jury could find that JDR is entitled to punitive damages by clear and convincing evidence, it becomes apparent that the trial evidence fails to meet this standard.

¶30    As explained above, JDR and Vivid share an irregular boundary line, with Vivid's property generally to the west, and JDR's property is generally to the

east. The parties' dispute centers around a 20-acre rectangular parcel of land that is located at one corner of a much larger piece of property that belongs to JDR. For ease of reference, we refer to this 20-acre portion of JDR's property as "the parcel" or "JDR's parcel." JDR's parcel juts into Vivid's property, so that the parcel is bordered by Vivid's property on the north, west, and south.

¶31    The location of the parcel's western and southern boundaries and the corner where these two boundaries intersect are particularly important for purposes of this opinion.[13]  The western boundary is a line that runs north-south for approximately one quarter mile. The southern boundary is a shorter line that runs east-west for approximately one eighth of a mile. For ease of reference, we refer to the intersection of the western and southern boundaries as the "southwest corner."

¶32    It is undisputed that Nelson Hardwood failed to accurately measure the western boundary of JDR's parcel and, further, that it misidentified the location of the parcel's southwest corner and its southern boundary line. Nelson Hardwood marked the southwest corner and the southern boundary line at least 300 feet north of their actual location, and as a result, a significant strip of JDR's parcel was erroneously marked as belonging to Vivid.[14]

---

[13] During trial, witnesses sometimes referred to the western boundary as the north/south line, and the southern boundary as the east/west line. We use the terms "western boundary" and "southern boundary" for clarity and consistency.

[14] Nelson Hardwood's logging manager acknowledged that he marked the southern boundary at least 300 feet north of its actual location, and JDR's property manager testified that it was "a lot farther than anybody has discussed," closer to 530 feet. It is not necessary to accurately determine the width of the strip of property that was wrongfully cut in order to resolve the issues on appeal.

¶33    The question in this appeal is whether a reasonable jury could find by clear and convincing evidence that the conduct that resulted in this error satisfies the intentional disregard standard provided in WIS. STAT. § 895.043(3). The trial testimony that is material to that question was provided by three witnesses:  Nelson Hardwood's logging manager, JDR's property manager, and JDR's expert witness.  We summarize that testimony here.

¶34    Marc Berg is Nelson Hardwood's logging manager, and he testified that he had approximately 30 years' experience working for Nelson Hardwood.  In December of 2013, he set out to mark Vivid's boundaries.  The terrain in the area was rough and rocky, and on that day was covered with over two feet of snow. Berg was accompanied by Brian Nelson, who is one of Nelson Hardwood's owners.  The two men started at the northwest corner of the parcel that we described above.  Nelson left Berg with the intention of rejoining him later.

¶35    Berg intended to walk south along the western boundary line until he found the southwest corner, and then to turn east and walk the southern boundary line until he reached the southeast corner.  According to a survey map Berg had referenced, the corners he was looking for were marked with three-quarter-inch-thick rebar rods, and there was a fence running east to west at the southern boundary line.  Berg located the rebar rod at the northwest corner of the parcel, and he began walking south, marking his path with blue ribbon.  According to his later testimony, Berg initially attempted to measure the 1,310-foot length of the western boundary by counting his paces.

¶36    Nelson rejoined Berg before he had finished pacing off the 1,310-foot distance, and the two men found a fence running east to west in that general vicinity.  According to Berg's later testimony, he saw a "pipe or rod" in the

16

ground, and he believed this to be the three-quarter-inch rebar rod he expected to find at the southwest corner. He also saw "ribbon," which is commonly used to mark property boundaries, in that area. Berg testified that based on the fence, the rod, and the ribbon, he believed they had located the southwest corner of JDR's parcel, and he "lost track" of his pacing by that time. Berg did not confirm whether the "pipe or rod" he saw was made of rebar or three quarters of an inch in diameter.

¶37 Berg and Nelson turned east and walked for an eighth of a mile along the fence line, marking trees and the fence with blue ribbon. Berg testified that he did not have any doubt that the fence he found was on the accurate boundary line at that time: "I thought the whole time I was on the right property line." However, as noted above, the fence line that the two men had found was in fact several hundred feet north of the actual boundary line.

¶38 After Berg and Nelson traversed the fence line that they believed was the southern boundary of JDR's parcel, they ran into another fence that marked the eastern boundary of the parcel. Berg testified that he believed that they were at the parcel's southeast corner but, in fact, they were several hundred feet north of this corner. According to the survey, there should have been another rebar rod marking the southeast corner, but Berg did not look for it. And according to an aerial map Berg had referenced, he should have been positioned somewhat differently relative to a field that was visible on the other side of the boundary line, but he did not notice this discrepancy. Berg acknowledged that he could have taken a number of steps to confirm whether he had reached the true location of the southeast corner, but he testified that he did not do so because "I thought I was there. So I didn't care."

17

¶39    JDR's property manager, Randy Manning, also testified at the trial. He was not present when Berg and Nelson marked the boundary lines and did not have any personal knowledge about the process they used. However, he testified that it would not have been possible for a person walking the parcel's western boundary to see the fence that Berg and Nelson found because there is a "big gap" in the fence where it would intersect with the western boundary line. He also testified that he visited what Berg identified as the southwest corner on a later date, and he did not find any corner marker at that point.

¶40    JDR also presented the expert testimony of Mark Mittelstadt, a forester who testified about standard practices for marking property boundaries. He testified that it is common to use survey maps and aerial photographs when marking boundaries, and that he often would also ask "landowners to show [him] where the boundaries are" because "that simplifies things quite a bit." Mittelstadt also testified that the pacing method that Berg attempted is commonly used when marking property boundaries, and that pacing should be used "to get in the vicinity and then start looking more precisely for something else."

¶41    Mittelstadt testified that Berg's error was "egregious" because "a person shouldn't make that big a mistake pacing," and because the aerial map should have made it clear to him he was in the wrong spot. According to Mittelstadt, based on the aerial map, Berg should have known that he was at the wrong place when he reached what he identified as the southeast corner of JDR's parcel; if Berg had been at the true southeast corner, he would have been "in the woods by 30 feet or so" and would not have been able to see a field that was conspicuously visible from the location he erroneously thought to be the corner. According to Mittelstadt, the location and appearance of the field should have been a "glaring red flag," but Berg disregarded it. Mittelstadt testified that such

errors lead to "cases like this," and although "the majority don't wind up in court," they lead to "resentment among neighbors."

¶42 For the reasons we now explain, we disagree with JDR that the evidence was sufficient to submit a punitive damages question to the jury.

¶43 JDR recognizes that, to be entitled to punitive damages, it must show that Nelson Hardwood acted in "intentional disregard" of its property rights. And as explained above, this requires "clear and convincing evidence" that Nelson Hardwood either acted "with a purpose to disregard" JDR's property rights, or, alternatively, was "aware" that its conduct was "substantially certain" to result in these rights being disregarded. *See Strenke*, 279 Wis. 2d 52, ¶¶38, 41.

¶44 Although JDR repeatedly asserts that Nelson Hardwood acted with "intentional disregard," it develops no clear argument that adequately links Berg's actions to either of these standards. JDR points to nothing in the record that would suggest that Berg acted with the specific purpose of disregarding its rights, and it does not develop any argument to that effect. We instead take JDR to be arguing that Berg was "aware" that his conduct was "substantially certain" to result in JDR's property rights being disregarded.

¶45 JDR's argument appears to be that Berg "did not care to take the appropriate steps" to accurately mark the boundary lines despite having "full knowledge as to what the appropriate steps were." JDR emphasizes the many ways that Berg could have checked to ensure he had accurately marked the southern boundary—he could have used a tape measure or GPS, he could have referenced his aerial survey map, he could have checked for a rebar rod when he reached what he thought was the southeastern corner of the parcel, he could have re-paced the distance after he lost count of his paces, or he could have contacted

JDR to help him locate the boundaries. Berg admitted to not taking any such precautions, but he testified that the reason he "didn't care" about confirming that he was in the right place was because he "thought [he] was there."

¶46    The evidence unmistakably shows that Berg was careless. As shown above, Berg carelessly relied on coincidental markers without taking precautions to ensure that they were what they first appeared to be, and then neglected to use other methods that would have helped him realize his error. But JDR fails to explain how this evidence shows that Berg was *aware* that his conduct was substantially certain to result in JDR's rights being disregarded. Instead, the evidence is consistent with Berg's testimony that he "thought [he] was there" but "screwed up." Berg's conduct is much more akin to the ordinary negligence described in *Henrikson* than the extraordinary conduct that was described in *Strenke* that unmistakably disregarded the rights of others.

¶47    Although JDR does not expressly say so, it may be arguing that Berg *should have been* aware that his conduct would lead to the disregard of JDR's property rights. But that is not the question; the question is whether Berg *was* aware of the risk that his conduct posed to JDR's property rights. *See Henrikson*, 314 Wis. 2d 225, ¶32 ("'Should have realized' that conduct created the prescribed risk requires a lesser degree of awareness than that required for punitive damages under the 'aware that [one's conduct was] substantially certain ...' standard.") (quoting *Strenke*, 279 Wis. 2d 52, ¶3) (brackets in original).

¶48    Finally, JDR may be arguing that, based on Berg's high degree of carelessness, a reasonable jury could infer that he *must have been* aware that his conduct was substantially certain to disregard JDR's property rights, despite his contrary testimony that he believed he was accurately marking the boundary. *See*

*Henrikson*, 314 Wis. 2d 225, ¶¶30-35 (addressing the question of when the record can support a reasonable inference of the requisite awareness). To the extent that JDR is making this argument, we disagree.

¶49 JDR contends that a reasonable jury could conclude that Berg was not credible, but JDR introduced little evidence to challenge Berg's version of the events.[15] The evidence does not show that Berg deviated from accepted boundary-marking practices to such an extent that the jury could find by clear and convincing evidence that he must have been aware that his conduct posed a risk to JDR's property rights. To be sure, Mittelstadt testified that Berg's error was "egregious," that it was not a "reasonable error," and that it was "impossible" for Berg's pacing to be as far off as it was. Yet Mittelstadt did not testify that Berg's error was so unreasonable that it could not have been an honest mistake. And, as was true in *Henrikson*, no evidence was introduced that Berg had previously made similar mistakes.

¶50 Additionally, Berg's conduct at least partly comports with Mittelstadt's testimony about what he should have done to accurately locate the boundary. Mittelstadt testified that pacing should be used "to get in the vicinity

---

[15] The only significant evidence that JDR introduced to challenge Berg's account is the testimony of JDR's property manager, Randy Manning. Manning testified that if Berg were walking due south on the western boundary, Berg could not have seen the fence line that he testified he found because there was a "big gap" in the fence at that point. We will assume this testimony to be true, but it is not clear how it helps JDR. Manning's testimony might suggest that Berg deviated from walking due south along the western boundary, but it is undisputed that Berg did somehow find the fence that he incorrectly marked as the southern boundary. Further, Manning's testimony loses much of its importance when one considers Berg's uncontroverted testimony that he did not locate the fence line alone. According to Berg, he and Nelson—who was *not* pacing the western boundary but was instead coming from the west—"met up where [they] thought the corner was at." Because Nelson was not walking along the boundary, he could have come across the fence despite the "big gap" in the fence where it intersects the western boundary.

and then start looking more precisely for something else." Even though the markers Berg and Nelson found were not what they first appeared to be, they were the sort of precise markers Mittelstadt testified that Berg should have been looking for.

¶51 As we have explained, when the court makes its gatekeeper decision, it may only submit a punitive damages question to the jury if a reasonable jury could find by "clear and convincing" evidence that the plaintiff is entitled to punitive damages. *Wischer*, 279 Wis. 2d 4, ¶34. We conclude that JDR has not met this standard. Berg's conduct is much more like the ordinary negligence described in *Henrikson* than the extraordinary conduct that unmistakably threatened the rights of others described in *Strenke*. JDR has failed to point to any evidence that Berg was aware that his conduct threatened Nelson Hardwood's property rights. And even if we assumed that there was *some* support for an inference that Berg knew his conduct posed a risk to JDR's property rights, that evidence is far from clear and convincing. We therefore conclude that JDR has not made a prima facie case for punitive damages under WIS. STAT. § 895.043.[16]

---

[16] JDR also makes arguments based on two other pieces of evidence, but for reasons we now explain, this evidence has no bearing on our analysis.

First, JDR points to evidence of "no trespassing" signs posted on its land, and it argues that these signs should have made Nelson Hardwood aware of its error. But it is undisputed that these signs did not identify who had posted them, or whether the posted property belonged to Vivid or JDR. JDR does not explain how these unmarked "no trespassing" signs would have alerted Berg or any other agent of Nelson Hardwood that the property did not belong to Vivid.

Second, JDR points to the testimony of a Vivid employee, who testified that Berg had been "angry with the cutters" and said that "something has gone very wrong." This exchange occurred several months after the wrongful cut had been completed, but before it had been discovered by JDR. Even assuming that Berg's reaction was related to the wrongful cut—an assumption that is not supported by competent evidence—we do not see how evidence that Berg was angry after the cut had already occurred supports a finding that Berg acted with intentional
(continued)

## CONCLUSION

¶52     For all these reasons, we conclude that a reasonable jury could not find by clear and convincing evidence that Nelson Hardwood acted with intentional disregard of JDR's property rights.  Accordingly, we affirm the circuit court's order declining to submit the question of punitive damages to the jury.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

---

disregard of JDR's property rights when he marked the property line.  If anything, it would support the conclusion that the Berg's conduct was not deliberate.